**Representative Christopher C. RANTS, Individually and as a Member and Speaker of the House of Representatives of the Eightieth General Assembly of the State of Iowa, and as Chairperson of the Iowa Legislative Council, and Senator Stewart E. Iver-**

son, Jr., Individually and as a Member and Majority Leader of the Senate of the Eightieth General Assembly of the State of Iowa, and as Vice–Chairperson of the Iowa Legislative Council, Appellants,

v.

Thomas J. VILSACK, Governor of the State of Iowa, Appellee.

No. 03–1948.

Supreme Court of Iowa.

June 16, 2004.

Richard J. Sapp, Paula S. Dierenfeld, John T. Clendenin, and Jordan B. Hansell of Nyemaster, Goode, Voigts, West, Hansell & O'Brien, P.C., Des Moines, for appellants.

Thomas J. Miller, Attorney General, and Julie F. Pottorff, Deputy Attorney General, for appellee.

Paul J. McAndrew, Jr. of Paul McAndrew Law Firm, Coralville, for amici curiae Representative Robert M. Hogg and Senators Jack Hatch and Keith A. Kreiman.

Edward M. Mansfield of Belin Lamson McCormick Zumbach Flynn P.C., Des Moines, for amicus curiae Iowa Association of Business and Industry.

MacDonald Smith of Smith & McElwain, Sioux City, for amicus curiae Iowa Federation of Labor, AFL–CIO.

Nolden Gentry and Thomas J. Levis of Brick, Gentry, Bowers, Swartz, Stoltze, Schuling & Levis, P.C., Des Moines, and Robert J. Henry and G. Gordon Atcheson of Blake & Uhlig, P.A., Kansas City, Kansas, for amicus curiae Iowa State Building & Construction Trades Council.

Bruce L. Braley of Dutton, Braun, Staack & Hellman, P.L.C., Waterloo, for amicus curiae Iowa Trial Lawyers Association.

Thomas D. Waterman, Stacey L. Hawke, and Wendy S. Meyer of Lane & Waterman, L.L.P., Davenport, for amicus curiae Iowans for Tax Relief.

Lance D. Ehmcke, Joel D. Vos, and Jeana L. Goosmann of Heidman, Redmond, Fredregill, Patterson, Plaza, Dykstra & Prahl, L.L.P., Sioux City, for amicus curiae National Conference of State Legislatures.

James A. Smith, Des Moines, for amicus curiae Iowa State Education Association.

CADY, Justice.

In this appeal, we consider whether Governor Thomas J. Vilsack (Governor) properly exercised the item veto power granted Iowa's governor by the Iowa Constitution when he vetoed several sections of an economic development bill passed by the general assembly (Legislature). After carefully scrutinizing the Governor's exercise of the item veto power in this case, we determine that his power was impermissibly exercised because the Governor attempted to veto items that were not part of an appropriation bill and thus were not subject to his item veto power. As a

result of the Governor's unconstitutional action, his attempted disapproval of portions of the bill has been rendered a nullity and ineffective. Moreover, by operation of the Iowa Constitution, no portion of the bill—including provisions approved by the Governor—became law because the bill as a whole failed to receive the affirmative approval of both the Legislature and Governor. Ultimately, we reverse the decision of the district court and remand this case for entry of summary judgment in favor of the Legislature.[1]

## I. Background Facts and Proceedings.

During the course of his annual message to the Legislature in January 2003, the Governor outlined several policy positions and initiatives that he hoped to see accomplished during the legislative session. *See* Iowa Const. art. IV, § 12 ("[The Governor] shall communicate, by message, to the General Assembly, at every regular session, the condition of the State, and recommend such matters as he shall deem expedient."). Key among the Governor's priorities was the stimulation and development of the state's economy. The core initiative suggested by the Governor for this purpose was the creation of an "Iowa Values Fund" (Values Fund), a monetary depository from which funds could be provided to certain persons or entities in hopes of stimulating various sectors of the state's economy. While the precise contours of this initiative had yet to take form, at least publicly, the Governor suggested to the Legislature that the program would be most successful if $500,000,000 was committed to the Values Fund over a five-year period.

As is prone to happening, particularly in times of divided government, the Legislature and the Governor had difficulty reaching an agreement on the best methods for economic development and the specific nature of the Values Fund. In particular, some members of the Legislature contended that successful economic development required tax and regulatory reform in addition to a large monetary commitment. While the Governor was not necessarily opposed to tax and regulatory reform in principle, he expressed his clear opinion that any tax reform should be "revenue neutral"—that is, it should not cause a depletion in the state's budget that might force the redistribution of state funds—and any regulatory reform should be equitable.

Near the time designated for the adjournment of the legislative session, the Iowa House of Representatives passed House File 683 (HF 683), a lengthy bill that, among other things, created a Values Fund, designated its management by a newly created governmental board, and appropriated funds to support the program. The Iowa Senate did not vote on HF 683 before the session adjourned, however, dealing a setback to the Governor and his economic development priorities. *See id.* art. III, § 17 ("No bill shall be passed unless by the assent of a majority of all the members elected to each branch of the General Assembly . . . .").

On May 29, 2003, the Governor issued a proclamation reconvening the Legislature into an "extraordinary session" focused on the state's budget for the 2004 fiscal year but also including a reconsideration of the

---

1. In adopting the nomenclature "Legislature" to generally identify the legislative appellants, we do not mean to imply that every legislator supports the positions advanced by the appellants as representatives of the Legislature. Our adoption of the "Governor" and "Legislature" designations is instead meant to underscore the fundamental conflicts in this case and its implications for the separation of powers.

Values Fund. *See id.* art. IV, § 11 ("[The Governor] may, on extraordinary occasions, convene the General Assembly by proclamation, and shall state to both Houses, when assembled, the purpose for which they shall have been convened."). After reconvening, legislative leaders met together to determine a legislative vision for economic development. The results of these meetings were two bills, an amended HF 683 and House File 692 (HF 692). Together, these bills created and funded a Values Fund and included provisions for tax and regulatory reform.[2] On June 4, the Legislature debated and passed HF 683 and HF 692, conveyed both to the Governor, and adjourned sine die.

On June 19, the Governor returned HF 683 and HF 692 to the office of the secretary of state pursuant to the process for consideration of legislation passed "during the last three days of a session." *Id.* art. III, § 16; *see also Redmond v. Ray,* 268 N.W.2d 849, 851, 853–55 (Iowa 1978) (discussing the governor's veto power and the meaning of the terminology "last three days of a session"). The Governor returned HF 692 with several sections marked "disapproved." *See* Iowa Const. art. III, § 16; *see also Redmond,* 268 N.W.2d at 851. In his letter transmitting HF 692, the Governor indicated that he was making several item vetoes to the bill because he believed changes to the tax code present in the bill were not revenue-neutral, various provisions would disrupt the operations of the Governor's office or the department of economic development, and still other provisions would unfairly affect persons injured by unsafe products, seeking redress in the workers' compensation system, or with low or middle incomes. The balance of HF 692, including provisions creating the Values Fund, was approved. Ultimately, the effect of the Governor's item vetoes was to eliminate the Legislature's economic development priorities while preserving the Governor's economic development priorities, including the Values Fund.

On July 30, Representative Christopher C. Rants, Speaker of the House of Representatives, and Senator Stewart E. Iverson, Jr., Majority Leader of the Senate, as taxpayers, citizens, and representatives of the Legislature, filed suit against the Governor challenging his item vetoes of HF 692. *See State ex rel. Turner v. Iowa State Highway Comm'n,* 186 N.W.2d 141, 147–48 (Iowa 1971) (discussing standing in the context of an item veto challenge). The challenge proceeded to a consideration of dueling motions for summary judgment, and on November 31, the district court issued its ruling adopting the Governor's proposed order and determining the item vetoes were constitutional. *See Welsh v. Branstad,* 470 N.W.2d 644, 647 (Iowa 1991) (discussing the propriety of summary judgment procedure in the context of an item veto challenge). The Legislature appealed immediately, and we expedited our consideration of its appeal in light of the gravity of the questions presented.

## II. Preservation of Error.

■■■ Both parties agree that the district court's ruling on the parties' motions for summary judgment has preserved all issues presented on appeal. The only lingering issue not considered and ruled upon by the district court is raised by amici

---

**2.** Given their complexity, it is difficult to adequately summarize the numerous, nuanced provisions of HF 683 and HF 692. Moreover, the length of both bills makes reprinting them in the course of our opinion or in an appendix impractical. Nevertheless, valuable insight into the bills and their contents can be gained from a full consideration of their text, which is available at 2003 Iowa Acts chs. 1, 2 (extraordinary session) or via the Legislature's website, http://www.legis.state.ia.us/Legislation.html.

curiae Representative Robert M. Hogg and Senators Jack Hatch and Keith A. Kreiman. These legislators contend that HF 692 was not "reconsidered" after the Governor's vetoes and claim this failed reconsideration somehow divests this court of its jurisdiction. *See* Iowa Const. art. III, § 16. In truth, this claim is not based on our jurisdiction but is instead based on whether our authority has been properly invoked. *See Keokuk County v. H.B.*, 593 N.W.2d 118, 122 (Iowa 1999). As noted, however, neither party raised this argument before the district court. *See In re K.C.*, 660 N.W.2d 29, 38 (Iowa 2003) ("Even issues implicating constitutional rights must be presented to and ruled upon by the district court in order to preserve error for appeal."). Moreover, the legislators, as amicus curiae, are unable to preserve this issue for our review. *Mueller v. St. Ansgar State Bank*, 465 N.W.2d 659, 660 (Iowa 1991) ("Under Iowa law, the only issues reviewable are those presented by the parties."); *Martin v. Peoples Mut. Sav. & Loan Ass'n*, 319 N.W.2d 220, 230 (Iowa 1982) ("Reviewable issues must be presented in the parties' briefs, not an amicus brief."). For these reasons, we do not reach this issue and turn instead to the arguments raised and preserved by the parties.

### III. Standards of Review.

Ultimately, the question of whether HF 692 was subject to the Governor's item veto power "is an issue of constitutional analysis which presents a question of law for the courts." *Junkins v. Branstad*, 448 N.W.2d 480, 482 (Iowa 1989) [hereinafter *Junkins II*]. This consideration is framed by our standards of review for examining a district court's grant of summary judgment. We have explained and applied the principles and parameters of this review in other cases in the item veto context and apply them in this case as well:

In reviewing the grant of summary judgment ... the question is whether the moving party demonstrated the absence of any genuine issue of material fact and showed entitlement to judgment on the merits as a matter of law. An issue of fact is "material" only when the dispute is over facts that might affect the outcome of the suit, given the applicable governing law. The requirement of a "genuine" issue of fact means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Our task on appeal is to determine only whether a genuine issue of material fact exists and whether the law was correctly applied. We examine the record in a light most favorable to the party opposing the motion for summary judgment to determine if movant met his or her burden.

*Junkins v. Branstad*, 421 N.W.2d 130, 132–33 (Iowa 1988) [hereinafter *Junkins I* ] (citations omitted); *accord Colton v. Branstad*, 372 N.W.2d 184, 187–88 (Iowa 1985); *see also Welsh*, 470 N.W.2d at 647–48.

In construing the Iowa Constitution, we generally apply the same rules of construction that we apply to statutes. *Junkins II*, 448 N.W.2d at 483. Our purpose in this process "is to ascertain the intent of the framers" of our constitution. *Id.; accord Redmond*, 268 N.W.2d at 853. To fulfill this purpose, "[w]e must look first at the words employed, giving them meaning in their natural sense and as commonly understood." *Redmond*, 268 N.W.2d at 853. If necessary, we may also "examine constitutional history" or "note the object to be attained or the evil to be remedied as disclosed by circumstances at the time of adoption." *Id.* Moreover, we may "look to the language of the item veto

amendments of the other ... states which have adopted them and the cases which have interpreted the phraseology employed in such constitutional provisions" when such analysis aids our interpretation of Iowa's constitutional provision. *Turner,* 186 N.W.2d at 150; *see also Redmond,* 268 N.W.2d at 852. In undertaking our consideration of this case,

> we are aware of the sensitivity with which we must decide inter-branch disputes. The efficient functioning of government depends on adherence by each branch to the delicate balance which must be maintained under the separation of powers precept. It also depends on cooperation among the branches and mutual respect for the system of checks and balances.

*Redmond,* 268 N.W.2d at 858; *see also State ex rel. Teachers & Officers of Indus. Inst. & Coll. v. Holder,* 76 Miss. 158, 23 So. 643, 643 (1898) ("The most difficult and delicate duty that ever falls to the lot of the court of last resort is ours today.... [W]e are called upon ... to fix the limitations upon the executive authority to veto the declared will of both houses of the legislature.").

### IV. The Veto Power Generally.

The executive veto power has its origins in ancient Rome. *See* Charles H. Zinn, *The Veto Power of the President,* 12 F.R.D. 207, 210 (1952) [hereinafter Zinn]. The word "veto," derived from Latin, means, "I forbid." *Id.* Since its inception over fifteen centuries ago, the veto power has evolved and diversified. What was once accomplished by a "single word by the Roman tribune" may now be accomplished in one of three ways. *Id.*

### 1. The General Veto Power.

In creating the American form of government, our nation's founders chose to provide a "general" veto power to the na-

tional executive. *See id.* at 212–13; *see also* U.S. Const. art. I, § 7. A similar general veto power is found in all but one state constitution. *See* Deborah S. Bartell, Note, *The Interplay Between the Gubernatorial Veto and the One–Subject Rule in Oklahoma,* 19 Okla. City U.L.Rev. 273, 284 (1994). This power features common elements and operates similarly in each jurisdiction. After the legislative body passes a bill, it is presented to the executive for approval or disapproval. *See, e.g.,* U.S. Const. art. I, § 7; Del. Const. art. III, § 18; Haw. Const. art. III, § 16; Iowa Const. art. III, § 16. The executive may provide affirmative approval of the entire bill by signing it or otherwise approving it, may simply permit the bill to automatically become law by failing to "return" it with a statement of explicit disapproval within a certain number of days, or may affirmatively disapprove the bill. *See, e.g.,* U.S. Const. art. I, § 7; Del. Const. art. III, § 18; Haw. Const. art. III, § 16; Iowa Const. art. III, § 16. If the executive disapproves the bill, the legislative body then has an opportunity to reconsider the legislation and pass it again—typically by a supermajority—over the executive's veto. *See, e.g.,* U.S. Const. art. I, § 7; Del. Const. art. III, § 18; Haw. Const. art. III, § 16; Iowa Const. art. III, § 16. This scheme operates to fulfill two purposes of the general veto power:

> (1) to give the executive suitable opportunity to consider the bills presented to him, and (2) to give the legislature a suitable opportunity to consider the executive's objection to bills and in appropriate cases to seek to pass them over the veto.

*Redmond,* 268 N.W.2d at 852. Ultimately, "the veto right constitutes a qualified negative check upon legislative power[,] ... a defensive tool, the purpose of

which is to help preserve the separation of powers." *Id.*

### 2. The Pocket Veto Power.

Very closely related to the general veto power is the "pocket" veto power. This veto power operates almost identically to the general veto power except for special conditions that are triggered when a legislative body passes a bill near the end of its session or when its adjournment prevents the return of a bill by the executive to the legislative body for reconsideration. *See, e.g.,* U.S. Const. art. I, § 7; Del. Const. art. III, § 18; Haw. Const. art. III, § 16; Iowa Const. art. III, § 16. These conditions typically extend the length of time the executive has to consider a bill, alter the method by which the bill is returned by the executive, and in many cases, change the mechanism of "automatic" approval based upon inaction to a requirement of affirmative approval or automatic *disapproval. See, e.g.,* U.S. Const. art. I, § 7; Del. Const. art. III, § 18; Haw. Const. art. III, § 16; Iowa Const. art. III, § 16. This final, subtle alteration to the general veto power, "[t]he provision that a bill shall finally fail if the Legislature, by adjournment, prevents such return is, in practical effect, a sort of penalty imposed upon the Legislature for depriving the Governor of the power of active veto." *Wood v. State Admin. Bd.,* 255 Mich. 220, 238 N.W. 16, 20 (1931).

### 3. The Item Veto Power.

After the Civil War, a number of states "began to amend their constitutions to allow Governors to veto items in an appropriation bill without having to veto the whole bill." Richard Briffault, *The Item Veto: A Problem in State Separation of Powers,* 2 Emerging Issues in St. Const. L. 85, 86–87 (1989) [hereinafter Briffault, *Separation of Powers*]. This form of the veto power, which came to be known as "item" or "line item" veto power, apparently originated in the Confederate States

Constitution and does not have a federal analogue. Zinn, 12 F.R.D. at 239; *see also* U.S. Const. art. I, § 7. Yet, while the national executive has not been provided an item veto power, most state executives have. Brent R. Appel, *Item Veto Litigation in Iowa: Marking the Boundaries Between Legislative and Executive Power,* 41 Drake L.Rev. 1, 5 (1992) [hereinafter Appel] ("Today, forty-three state constitutions include item veto or some form of item veto.").

Generally speaking, the item veto power developed "to control logrolling, or the legislators' practice of combining in a single bill provisions supported by various minorities in order to create a legislative majority." Briffault, *Separation of Powers,* 2 Emerging Issues in St. Const. L. at 87. In this fashion, the item veto power serves as a companion to "single-subject" constitutional provisions, which are meant "to prevent logrolling by requiring legislatures to limit bills to a single subject." Richard Briffault, *The Item Veto in State Courts,* 66 Temp. L.Rev. 1171, 1177 (1993) [hereinafter Briffault, *State Courts*]; *see also* Iowa Const. art. III, § 29 (providing, in part, "Every act shall embrace but one subject, and matters properly connected therewith; which subject shall be expressed in the title...."); *Utilicorp United Inc. v. Iowa Utils. Bd.,* 570 N.W.2d 451, 454–55 (Iowa 1997) (describing general principles related to Iowa's single-subject provision). However, the item veto actually "represents the coming together of three widespread state constitutional policies: the rejection of legislative logrolling; the imposition of fiscal restrictions on the legislature; and the strengthening of the governor's role in budgetary matters." Briffault, *State Courts,* 66 Temp. L.Rev. at 1177.

██ The item veto power provides a substantial limitation on the principle that "[t]he appropriation of money is essentially a legislative function under our scheme of government." *Welden v. Ray,* 229 N.W.2d 706, 709 (Iowa 1975); *see also* Iowa Const.

art. III, § 24; *Republican Party v. Smith*, 638 So.2d 26, 28 (Fla.1994) (construing a similar constitutional provision, which "gives to the Legislature 'the exclusive power of deciding how, when, and for what purpose the public funds shall be applied in carrying on the government'" (citation omitted)). In fact, the item veto power grants the governor a limited legislative function in relation to appropriation bills. *Harbor v. Deukmejian*, 43 Cal.3d 1078, 240 Cal.Rptr. 569, 742 P.2d 1290, 1295 (1987); *Jessen Assocs., Inc. v. Bullock*, 531 S.W.2d 593, 598 (Tex.1975); *see also* Zinn, 12 F.R.D. at 214. This legislative function runs contrary to the inherent "power to specify how the money shall be spent" granted the legislature through the general appropriation power. *Welden*, 229 N.W.2d at 710. It is also a significant deviation from the traditional separation of powers between the three branches of government. *See* Iowa Const. art. III, § 1; *see also Welden*, 229 N.W.2d at 709–10. For these reasons, the item veto power is to be construed narrowly, and any doubt over the extent of the power "should be resolved in favor of the traditional separation of governmental powers and the restricted nature of the veto." *Wood*, 238 N.W. at 18; *see also Colo. Gen. Assembly v. Lamm*, 704 P.2d 1371, 1385–86 (Colo. 1985); *State ex rel. Cason v. Bond*, 495 S.W.2d 385, 392 (Mo.1973); *Drummond v. Beasley*, 331 S.C. 559, 503 S.E.2d 455, 457 (1998). All of these factors have prompted one commentator to observe, "whatever the veto's successes in dealing with budget problems, by empowering the executive to veto a part of a bill, the item veto opens up a set of knotty legal and conceptual difficulties." Briffault, *Separation of Powers*, 2 Emerging Issues in St. Const. L. at 86 (footnote omitted).

## V. The Veto Power in Iowa.

We have described the general and pocket veto powers of Iowa's governor at length in two prior cases. *Redmond*, 268 N.W.2d at 851–52; *Darling v. Boesch*, 67 Iowa 702, 706–07, 25 N.W. 887, 889 (1885). These descriptions reveal that the nature of these powers arising from the Iowa Constitution is consistent with the provisions of other constitutions:

Under [article III, section 16 of the Iowa Constitution] a governor ordinarily has three days after a bill is presented to him, not counting Sunday, within which to veto it. If he does not veto it in those three days the bill becomes law without his signature. If he wishes to veto it, he must endorse his disapproval upon the bill and return it before the deadline to the house in which it originated so the legislature may reconsider it and possibly pass it by sufficient votes to override the veto.

One exception is made. A bill does not become law through the governor's failure to sign or veto it within the regular period if the general assembly "by adjournment prevent such return." Bills presented during the last three days of a session come within this exception because final adjournment shortens the available period for returning them. Adjournment would thus prevent the return of bills held by the governor for the full period of consideration. Therefore, instead of becoming law automatically if not approved within that period, bills submitted in the last three days of a session do not become law unless the governor endorses his approval on them. [Article] III [section] 16 gives him [thirty] days after adjournment within which to decide whether to do so.

*Redmond*, 268 N.W.2d at 851; *see also Darling*, 67 Iowa at 706–07, 25 N.W. at 889.

Iowa citizens provided Iowa's governor the item veto power by ratifying an amendment to our constitution in 1968. *See Turner*, 186 N.W.2d at 150 ("Prior to that time the Governor of Iowa had no power under the Iowa Constitution to veto any portion of a bill."). One need only look to the jurisprudential development of this power in Iowa for proof of the "knotty legal and conceptual difficulties" it presents. Briffault, *Separation of Powers*, 2 Emerging Issues in St. Const. L. at 86. Nevertheless, several definitions and principles from our prior cases guide the coordinate branches in the consideration of whether the item veto power may be permissibly exercised. This analysis launches, of course, from the language of our constitution. *See Redmond*, 268 N.W.2d at 853. The item veto power is derived from article three, section sixteen of the Iowa Constitution, which provides, in part:

> The Governor may approve appropriation bills in whole or in part, and may disapprove any item of an appropriation bill; and the part approved shall become a law. Any item of an appropriation bill disapproved by the Governor shall be returned, with his objections, to the house in which it originated, or shall be deposited by him in the office of the Secretary of State in the case of an appropriation bill submitted to the Governor for his approval during the last three days of a session of the General Assembly, and the procedure in each case shall be the same as provided for other bills. Any such item of an appropriation bill may be enacted into law notwithstanding the Governor's objections, in the same manner as provided for other bills.

This constitutional language creates two core considerations that must be part of every analysis of an exercise of the item veto power.

## 1. Appropriation Bill.

 Pursuant to our constitutional language, every analysis of the item veto power must begin with a determination of the nature of the bill that the governor is attempting to item veto. The fundamental prerequisite for the proper exercise of the item veto power is that the bill to be item vetoed is an appropriation bill. *See* Iowa Const. art. III, § 16. This requirement springs from the language of the section and is the primary qualification on the exercise of the item veto power. *See id.* Its importance is underscored by the very nature of the three veto powers and the deviation from the traditional scheme of separation of powers implicit in the item veto power. *See id.; Redmond*, 268 N.W.2d at 851; *see also* Iowa Const. art. III, § 1; *Welden*, 229 N.W.2d at 709–10. Ultimately, this vital determination of whether the bill in question is an appropriation bill in the constitutional sense is for the courts. *Junkins I*, 421 N.W.2d at 135.

Nearly every one of our prior cases in the item veto context has contributed to our definition of an appropriation bill, which is otherwise undefined in the constitution. *See Junkins II*, 448 N.W.2d at 483–85; *Junkins I*, 421 N.W.2d at 134; *Welden*, 229 N.W.2d at 710–11; *Turner*, 186 N.W.2d at 149–50; *see also* Iowa Code § 3.4 (2003) (defining an appropriation bill as "a bill which has as its primary purpose the making of appropriations of money from the public treasury"). However, *Junkins II*, decided in 1989, has been our most thorough consideration of the definition of appropriation bill to date. In *Junkins II*, we observed,

> We believe the proper test [of whether a bill is an appropriation bill] is to review each bill on an ad hoc basis and determine whether the bill contains an appropriation which could significantly affect the governor's budgeting responsibility.

448 N.W.2d at 484–85. As a corollary to this definition, we also stated,

> [w]e believe that the allocation of funds, whether from the general fund or from a revenue-producing bill, into a separate and distinct fund that the State can no longer utilize for other purposes absent subsequent legislation, is an appropriation as intended by article III, section 16.

*Id.* at 483. In crafting these definitions, we rejected both the "single appropriation" and "primary purpose" tests of whether a bill is an appropriation bill in favor of the test excerpted above. *See id.* at 484; *see also* Iowa Code § 3.4.

The parties in this case differ significantly in their interpretations of the definition of an appropriation bill. The different constructions offered by both parties are no doubt the result of attempting to apply our definition in light of the appropriation bill at issue in *Junkins II,* which was quite different from the appropriation bills we have dealt with in our other item veto cases. *See, e.g., Welsh,* 470 N.W.2d at 645–47; *Colton,* 372 N.W.2d at 185–86; *Welden,* 229 N.W.2d at 707–09; *Turner,* 186 N.W.2d at 149–50. Indeed, it appears that the appropriation bill subject to item veto in *Junkins II* marks the outer reaches of the definition of an appropriation bill as this court and other legal authorities have construed that term. *Compare Junkins II,* 448 N.W.2d at 484, *with Harbor,* 742 P.2d at 1290–91; *Welsh,* 470 N.W.2d at 645–47; *Colton,* 372 N.W.2d at 185–86; *Welden,* 229 N.W.2d at 707–09; *Turner,* 186 N.W.2d at 149–50; *State ex rel. Sego v. Kirkpatrick,* 86 N.M. 359, 524 P.2d 975, 980–82 (1974). *See generally* Appel, 41 Drake L.Rev. at 12–14 (discussing the definition of an appropriation bill); Briffault, *State Courts,* 66 Temp. L.Rev. at 1198–1203 (same).

In each of our pre-*Junkins II* item veto cases, the determination of whether the vetoed items were a portion of an appro-priation bill was significantly easier. This is because each of these bills contained at least one allocation of a monetary amount on the face of the bill, clearly signifying an appropriation of some sort as that term has traditionally been understood. *See, e.g., Welsh,* 470 N.W.2d at 645–47 (considering item vetoes of provisions of 1989 Iowa Acts chapters 307, 308, and 319); *Colton,* 372 N.W.2d at 185–86 (considering item vetoes of provisions of 1983 Iowa Acts chapter 206); *Rush v. Ray,* 362 N.W.2d 479, 481 (Iowa 1985) (considering item vetoes of provisions of 1979 Iowa Acts chapters 4, 5, and 14 and 1980 Iowa Acts chapters 1001 and 1007); *Welden,* 229 N.W.2d at 707–09 (considering item vetoes of provisions of 1978 Iowa Acts chapters 111, 113, 114, 115, and 117); *Turner,* 186 N.W.2d at 149–50 (considering item vetoes of provisions of 1969 Iowa Acts chapter 30). In contrast, the bill in *Junkins II* did not contain at least one allocation of a monetary amount on the face of the bill. *See Junkins II,* 448 N.W.2d at 481 (considering item vetoes of provisions of 1985 Iowa Acts chapter 197). Instead, the sections of the bill identified as appropriations allocated funds by either directly ordering an expenditure or commanding alterations to standing allocations within sections of the Iowa Code resulting in the expenditure of funds absent subsequent legislation to stop the expenditure or somehow redirect it. *See id.* at 484. The alterations, made on the face of the bill, simply changed the amounts of standing allocations based on preexisting legislation and appropriations. No further legislative action was needed to permit the expenditure of funds as directed, with alterations, by the bill.

Thus, we have identified two types of appropriation bills in our item veto cases, both of which allocate funds "whether from the general fund or from a revenue-producing bill, into a separate and distinct fund that the State can no longer utilize

for other purposes absent subsequent legislation." *Id.* at 483. The first type, which may be considered a "traditional" appropriation bill, is marked by the inclusion of at least one allocation of a monetary amount on the face of the bill. The second type, first considered in *Junkins II,* is marked by the allocation of funds by either the direct ordering of an expenditure or the commanded alteration to standing allocations within sections of the Iowa Code resulting in the expenditure of funds absent subsequent legislation to stop the expenditure or somehow redirect it.

## 2. Item.

The second key element in the construction of the item veto power arises from the provision of article III, section 16 that provides that the governor "may disapprove any item of an appropriation bill." Iowa Const. art. III, § 16. This language—particularly the term "item"—has caused this court and other courts their greatest interpretive difficulty. *See* Appel, 41 Drake L.Rev. at 17 ("The determination of what constitutes an 'item' is the most troublesome issue in item veto law."). In our first consideration of the item veto power, we observed that "[e]ither by circumstance or design, our item veto amendment makes no reference to appropriations 'of money' in its provisions which enable a governor to approve appropriation bills in whole or in part, and permits the disapproval of any 'item' of an appropriation bill." *Turner,* 186 N.W.2d at 149. Thus, in *Turner* and subsequent cases, we have acknowledged that the governor may con-

stitutionally veto nearly any item in an appropriation bill even if that item is not a monetary allocation. *See Welsh,* 470 N.W.2d at 649–50; *Colton,* 372 N.W.2d at 190; *Welden,* 229 N.W.2d at 714; *Turner,* 186 N.W.2d at 150–52.

This broad definition of an item requires a difficult calculation to ensure a proper balance between the executive and legislative branches. As we observed in *Welsh,* "on the one hand, the Governor may not selectively strike words and phrases from 'conditions inextricably linked to an appropriation,' and, on the other hand, the legislature may not block [an] item veto by attaching 'unrelated riders' to an appropriation." 470 N.W.2d at 649 (quoting *Colton,* 372 N.W.2d at 190–91); *see also Rush,* 362 N.W.2d at 482–83; *Welden,* 229 N.W.2d at 710–13. In attempting to draw the line between permissible and impermissible actions by our coordinate branches in this area, we have generally defined a condition as "a provision in a bill that limits the use to which an appropriation may be put."[3] *Colton,* 372 N.W.2d at 189. A rider, on the other hand, has been generally defined as "an unrelated substantive piece of legislation incorporated in the appropriation bill." *Id.* at 191.

Yet, merely stating these definitions belies the difficulty in defining a condition or a rider or the difference between them. Thus,

we have consistently recognized that the fundamental test for determining the validity of an item veto under article III, section 16 . . . is whether the vetoed portion of the legislation

---

**3.** Through the course of our prior opinions in the item veto context, we have also used the terms "proviso," "restriction," "qualification," and "limitation" to describe a "condition," as we use that term in this opinion. *Welsh v. Branstad,* 470 N.W.2d 644, 649–50 (Iowa 1991); *Colton v. Branstad,* 372 N.W.2d 184, 188–91 (Iowa 1985); *Rush v. Ray,* 362 N.W.2d 479, 481–83 (Iowa 1985); *Welden v. Ray,* 229 N.W.2d 706, 710 (Iowa 1975); *State ex rel. Turner v. Iowa State Highway Comm'n,* 186 N.W.2d 141, 148–50 (Iowa 1971). Each of these terms is synonymous as each denotes "a provision in a bill that limits the use to which an appropriation may be put." *Colton,* 372 N.W.2d at 189.

may be taken out of a bill without affecting its other purposes and provisions. It is something that can be lifted bodily from it rather than cut out. No damage can be done to the surrounding legislative tissue, nor should any scar tissue result therefrom.

*Welsh,* 470 N.W.2d at 648; *accord Rush,* 362 N.W.2d at 481; *Turner,* 186 N.W.2d at 151. Pursuant to this theory, if the provision to be item vetoed is a "separate, severable provision[] on which appropriations were not dependent for passage by the legislature," the provision is "subject to separate veto under the Governor's authority to veto part of an appropriation bill." *Welden,* 229 N.W.2d at 714; *accord Welsh,* 470 N.W.2d at 650; *Colton,* 372 N.W.2d at 190–91; *Turner,* 186 N.W.2d at 150–52. However, if the removal of the provision would permit the governor to "legislate by striking qualifications [on appropriations] in a manner which distorts legislative intent" or to "divert money appropriated by the legislature for one purpose so that it may be used for another," we consider it an inseparable statement of the legislature's will, impervious to an item veto unless both the condition and the appropriation to which it is related are item vetoed together. *Rush,* 362 N.W.2d at 482 ("The vetoed language created conditions, restricting the use of the money to the stated purpose. It is not severable, because upon excision of this language, the rest of the legislation is affected."); *see also Welsh,* 470 N.W.2d at 648–49; *Colton,* 372 N.W.2d at 189; *Welden,* 229 N.W.2d at 713 ("[I]f the Governor wishes to veto a legislatively-imposed qualification upon an appropriation, he must veto the accompanying appropriation as well.").

### 3. Summary.

In summary, each consideration of the exercise of the governor's item veto power warrants two core considerations. The primary consideration is whether the bill to be item vetoed is an appropriation bill. *See* Iowa Const. art. III, § 16. We have previously recognized two types of appropriation bills, a traditional form which contains at least one allocation of a monetary amount on the face of the bill, and a specialized type, recognized in *Junkins II,* which allocates funds by either directly ordering an expenditure or commanding alterations to standing allocations within sections of the Iowa Code resulting in the expenditure of funds absent subsequent legislation to stop the expenditure or somehow redirect it. If a bill is an appropriation bill, it is subject to the governor's item veto power. *See* Iowa Const. art. III, § 16. If it is not an appropriation bill, it is subject only to the governor's general or pocket veto powers and may not be item vetoed. *See id.*

Furthermore, the governor may exercise the item veto power only on an item or items in an appropriation bill. *See id.* We generally recognize three types of items that may be item vetoed. The first is a specific appropriation made on the face of the bill. The second is a rider, "an unrelated substantive piece of legislation incorporated in the appropriation bill." *Colton,* 372 N.W.2d at 191. The third is a condition, "a provision in a bill that limits the use to which an appropriation may be put," which may be vetoed *only* if the appropriation accompanying it is vetoed as well. *Id.* at 189; *Welden,* 229 N.W.2d at 709. However, a condition, standing apart from its appropriation, may not be item vetoed because such a veto would invade the legislative prerogative to "specify how money shall be spent," granted through the general appropriation power. *Welden,* 229 N.W.2d at 710. A provision must fall within one of these three types and cir-

cumstances to be subject to the item veto power.

### VI. Item Vetoes of HF 692.

 We now consider whether the Governor constitutionally exercised his item veto power in item vetoing provisions of HF 692. The first issue that must be considered is whether HF 692 is an appropriation bill. *See* Iowa Const. art. III, § 16. The Governor contends it is and asserts it is subject to item veto because several provisions in the bill bring it under the definition of an appropriation bill provided in *Junkins II.* 448 N.W.2d at 484–85. Each of these provisions, he believes, "contains an appropriation which could significantly affect [his] budgeting responsibility." *Id.* In support of this argument, he offers evidence that these provisions allocate amounts which the Governor deems significant "from the general fund or from a revenue-producing bill, into a separate and distinct fund that the State can no longer utilize for other purposes absent subsequent legislation." *Id.* at 483. In the presence of these allocations, the Governor argues, he could properly item veto provisions of HF 692.

In counterpoint, the Legislature argues that HF 692 is not an appropriation bill because no portion of the bill allocates funds or operates in either of the methods described by our prior cases. *See id.* Instead, it contends that HF 692 is a typical legislative bill that includes several policy provisions related to economic develop-ment. Thus, if the Governor wished to exercise his veto powers in relation to the bill, he was limited to exercising only the general or pocket veto power, not the item veto power. In short, the Legislature contends that the Governor was not permitted to item veto provisions of HF 692.

In scrutinizing the parties' arguments, a further fundamental interpretive difference is revealed. At nearly every turn, the Governor contends that a simple reference to HF 683 or other matters reveals that HF 692 is an appropriation bill. The Legislature argues that taking this step in the item veto analysis goes beyond the analytical principles elucidated in our prior cases, lacks support of any type, and presents a significant threat to the separation of powers. The Legislature essentially argues that the Governor's item veto power must be applied in light of the nature of the bill sought to be vetoed. For several reasons, we agree.

Clearly, HF 683 and HF 692 are related in numerous ways. Yet, none of these ways is relevant for the constitutional analysis of whether the item veto power has been properly exercised in relation to HF 692. In fact, the Governor has failed to cite any true authority in support of an approach that looks to another pending bill to determine whether the bill sought to be item vetoed is an appropriation bill, offering only general statements on separation of powers principles in support of his approach.[4] Yet, we believe his approach po-

---

**4.** Our own search for authority supporting the Governor's suggested approach divulged a single case in which the California Supreme Court, in refusing to undertake a similar analysis, observed, "We are aware of no authority which even remotely supports the attempted exercise of the veto in this manner." *Harbor v. Deukmejian,* 43 Cal.3d 1078, 240 Cal.Rptr. 569, 742 P.2d 1290, 1296–97 (1987); *accord* Julie F. Pottorff, *Political Stew: Item Veto Issues Bubbling to the Top in State Court* *Jurisdictions,* 1 Emerging Issues in St. Const. L. 121, 125 (1988) ("Whatever the manner in which a court may define an appropriation bill for item veto purposes, the decision from the California Supreme Court in *Deukmejian* suggests the bill may not be defined to extend beyond its four corners to include pieces of other substantive legislation."); *see also N. Slope Borough v. Sohio Petro. Corp.,* 585 P.2d 534, 543 n. 11 (Alaska 1978) ("Only bills are approved or vetoed, not the contents of the

ses the graver threat to the separation of powers.

■ If we were to accept and apply the Governor's approach, we would be condoning a vast expansion of the scope and reach of the governor's item veto power, contrary to the intent of article III, section 16. Feasibly, every bill that is somehow linked to another bill that contains a related appropriation—which HF 683 undoubtedly does—could be reached by the governor's item veto power. However, the item veto power is a limited, negative power and cannot be expanded in this way. *See Welden*, 229 N.W.2d at 711; *accord Colo. Gen. Assembly*, 704 P.2d at 1385–86; *Cason*, 495 S.W.2d at 392; *Drummond*, 503 S.E.2d at 457. Instead, we must examine the face of the bill sought to be item vetoed to determine if it is subject to the item veto power, as we have in each of our prior cases in this area. *See, e.g., Junkins II*, 448 N.W.2d at 484; *Colton*, 372 N.W.2d at 185–86; *Turner*, 186 N.W.2d at 149.

The Governor does not contend that HF 692 is a traditional appropriation bill marked by the inclusion of at least one allocation of a monetary amount on the face of the bill. Instead, he claims four portions of HF 692, encompassing several sections of the bill, when read in light of our decision in *Junkins II*, are appropriations, and pursuant to our prior expressed definition of an appropriation bill, render the whole of HF 692 subject to item veto. On closer analysis, however, we believe the Governor has misconstrued our prior item veto holdings, which instead reveal HF 692 does not contain any appropriations.

■ The first provision identified by the Governor as an appropriation is section 84 of HF 692, which creates the framework for the Values Fund. *See* 2003 Iowa Acts ch. 1, § 84 (extraordinary session).

The Governor contends that this section is an appropriation based on a provision providing "[p]ayments of interest, repayments of moneys loaned pursuant to this chapter, and recaptures of grants or loans shall be deposited in the fund." *Id.* Further, he contends that this section altered the method by which funds leftover in the Values Fund would "revert" at the end of the fiscal year. *Id.* He contends both of these provisions are appropriations because both allocate funds "whether from the general fund or from a revenue-producing bill, into a separate and distinct fund that the State can no longer utilize for other purposes absent subsequent legislation." *Junkins II*, 448 N.W.2d at 483.

We do not believe section 84 is an appropriation. We have previously rejected a governor's item vetoes of similar reversionary provisions in *Welsh* and *Welden*. *See* 470 N.W.2d at 649; 229 N.W.2d at 708, 713–14. More importantly, section 84, on its face, does not involve the allocation of funds by either directly ordering an expenditure or commanding alterations to standing allocations within sections of the Iowa Code resulting in the expenditure of funds absent subsequent legislation to stop the expenditure or somehow redirect it. Instead, section 84 is dependent on further legislative action outside of the policy provisions crafted in HF 692 to make the Values Fund contemplated in section 84 functional. Thus, HF 692 differs from the bill in *Junkins II*, where no further legislative action was needed to permit the expenditure of funds as directed, with alterations, by the bill.

Admittedly, further legislative action related to section 84 was contemplated in HF 683. *See* 2003 Iowa Acts ch. 2 (extraordinary session). Yet, as we have noted, there is nothing to warrant reading the

house and senate journals, or the tape record-

ings of committee and floor debates.").

two bills together for an item veto analysis, which focuses on the face of the bill sought to be item vetoed to determine if it is subject to the item veto power. In effect, we believe the provisions of HF 692 create a "savings account" for the Values Fund and describe how the fund will operate, but do not place funds or alter funds that are to be spent pursuant to mandatory statutory language that are currently placed in that account. It is that placement or alteration of funds which is at the heart of the appropriation power and which triggers the Governor's ability to item veto.

■ A similar conclusion obtains when we examine the other provisions contended by the Governor to be appropriations. These provisions provide for compensation and expense payments for members of boards created in HF 692, change fines and surcharges related to the workers' compensation act, and reduce income tax rates. *See* 2003 Iowa Acts ch. 1, §§ 44–72, 78, 80, 81, 85, 106, 122, 127 (extraordinary session). We do not believe the provisions providing for compensation and expense payments for board members are allocations of any sort. These provisions call for the director of the department of economic development and state auditor to "budget" for the positions but do not allocate funds to fulfill those budget items. 2003 Iowa Acts ch. 1, §§ 78, 80, 81, 85, 106 (extraordinary session); *see also* Iowa Code § 8.2(2) (discussing the nature of budgetary authority). Any such allocation is dependent on later legislative action, which, presumably, would constitute a traditional appropriation bill by the inclusion of at least one allocation of a monetary amount on the face of the bill. *See id.* § 7E.6(6).

The Governor's contention that changes to fees related to the workers' compensation act are appropriations is similarly infirm. The first change, arising from section 122 of HF 692, would increase the *possible* assessment that *may* result if an employer fails to file certain reports pursuant to the workers' compensation act. 2003 Iowa Acts ch. 1, § 122 (extraordinary session). This series of possibilities is contingent on matters extraneous to HF 692, which does not, on its face, allocate funds by either directly ordering an expenditure or commanding alterations to standing allocations within sections of the Iowa Code resulting in the expenditure of funds absent subsequent legislation to stop the expenditure or somehow redirect it. The second change, arising from section 127, adjusts an unemployment fund surcharge. *Id.* ch. 1, § 127. Yet, this surcharge does not order an expenditure or affect a standing allocation because any allocation from the fund is dependent on later legislative action not contemplated in HF 692. *See* Iowa Code § 96.7(12)(*c* ).

■ Finally, the Governor contends that alterations to the state tax code to reduce income tax rates provided for in HF 692 are appropriations. 2003 Iowa Acts ch. 1, §§ 44–72 (extraordinary session). This contention is divorced from our prior case precedents and basic logic. The effect of the provisions altering the tax code would result in the *reduction* of the state general fund. We simply cannot comprehend how a reduction in the general fund could be considered the allocation of funds "from the general fund or from a revenue-producing bill, into a separate and distinct fund that the State can no longer utilize for other purposes absent subsequent legislation." *Junkins II,* 448 N.W.2d at 483. Indeed, as one court has observed, " '[T]axation and appropriation are more nearly antonyms than synonyms.' " *State ex rel. Finnegan v. Dammann,* 220 Wis. 143, 264 N.W. 622, 624 (1936) (citation omitted); *see also Black &*

*White Taxicab Co. v. Standard Oil Co.,* 25 Ariz. 381, 218 P. 139, 144 (1923); *City of Camden v. Byrne,* 82 N.J. 133, 411 A.2d 462, 468 (1980); *State ex rel. Sundby v. Adamany,* 71 Wis.2d 118, 237 N.W.2d 910, 918 (1976). A reduction in state revenues is not an allocation of funds and is thus not an appropriation. *See Junkins II,* 448 N.W.2d at 483.

Ultimately, none of the sections that the Governor identifies as appropriations is an appropriation. Thus, there is no need to consider the further question of whether these provisions "significantly affect [his] budgeting responsibility." *Id.* at 484–85. Moreover, it is not necessary for us to examine each of the Governor's item vetoes to determine whether each fell within one of the three types and circumstances subject to the item veto power. Without an appropriation on its face, HF 692 is not an appropriation bill. For this reason, HF 692 was subject only to the Governor's general or pocket veto power and, accordingly, could not be item vetoed but only approved or disapproved as a whole. In attempting to item veto its provisions, the Governor acted unconstitutionally.

## VII. Result.

Both parties have presumed that an improper exercise of the Governor's item veto power would result in the automatic passage of those provisions attempted to be item vetoed, which would then join the other sections of the bill seemingly approved by the Governor as Iowa law. This presumption is understandable based on statements in some of our prior cases that indicated this result. Primary among these statements is one made in *Turner,* where we observed:

> In Iowa our Constitution does not require the Governor's affirmative approval of a bill before it becomes a law, but, conversely, does require the Governor's affirmative disapproval in exercising the veto power. It necessarily follows therefore that should the Governor of Iowa exceed his authority and attempt to disapprove an item in a nonappropriation bill, or to disapprove part of an appropriation bill which is not in and of itself an 'item,' the natural result would be that the bill as a whole would become law as though he had approved it or had failed to exercise the affirmative disapproval required by our Constitution.

*Turner,* 186 N.W.2d at 151; *accord* Appel, 41 Drake L.Rev. at 9. However, our prior examination of the veto power in Iowa reveals that this observation in *Turner* is only partially correct.

It is apparent, in deciding *Turner,* that we overlooked the importance of the timing of a governor's consideration of a bill and, in fact, misstated the effect a governor's failure to approve a bill will have depending on the point at which the governor is considering the bill. A bill may become law automatically if presented to the governor prior to "the last three days of a session" and if the governor does not return the bill within three days. Iowa Const. art. III, § 16; *see also Redmond,* 268 N.W.2d at 851, 853–55. However, if a bill is passed "during the last three days of a session," it will only become law upon the affirmative approval of the governor. *See* Iowa Const. art. III, § 16; *see also Redmond,* 268 N.W.2d at 851; *Darling,* 67 Iowa at 706–07, 25 N.W. at 889. To the extent we misstated these constitutional principles in *Turner* or our other item veto cases, our misstatements in those cases are disregarded. *See* 186 N.W.2d at 151.

In this case, the Legislature immediately adjourned sine die after conveying HF 683 and HF 692 to the Governor. Thus, the Governor had thirty days in which to approve the bills or both would have failed due to the absence of the Governor's affir-

mative approval. Iowa Const. art. III, § 16. The Governor attempted to approve HF 692 in part and disapprove it in part on the theory he was permitted to item veto its provisions. However, as we have discussed, the Governor's attempted item vetoes were unconstitutional. More importantly, because they were unconstitutional, his act of attempting to veto certain provisions of the bill is rendered a nullity and ineffective. *Welden,* 229 N.W.2d at 715 ("The attempted vetoes by the Governor are beyond the scope of the item-veto amendment and are of no effect."); *see also Turner,* 186 N.W.2d at 151; 63C Am. Jur.2d *Public Funds* § 44, at 263 (1997); Appel, 41 Drake L.Rev. at 9; Don Muyskens, Note, *Item Veto Amendment to the Iowa Constitution,* 18 Drake L.Rev. 245, 247–48 (1968) [hereinafter Muyskens]. The effect of this circumstance is to render the bill whole, as if the item vetoes never occurred. *Turner,* 186 N.W.2d at 151; *see also Welden,* 229 N.W.2d at 715; Muyskens, 18 Drake L.Rev. at 247–48.

However, this result creates an unanticipated quandary. Had the Governor impermissibly exercised his item veto authority during the period in which his general veto power was in effect, thus effectively failing to veto any provision, the bill would have become law automatically. *Turner,* 186 N.W.2d at 151; *see also* 63C Am. Jur.2d *Public Funds* § 44, at 263 ("If a governor's partial veto of an appropriation bill is void, the veto is disregarded and the bill is given the effect intended by the legislature. . . ."); Muyskens, 18 Drake L.Rev. at 247–48. The appropriate conclusion in such a situation would be that the bill became law because the Governor failed to approve or disapprove it before the end of three days. *See* Iowa Const. art. III, § 16; *Redmond,* 268 N.W.2d at 851; *Darling,* 67 Iowa at 706–07, 25 N.W. at 889. However, in this case, the Governor has impermissibly exercised his item

veto authority during the period in which his pocket veto power was in effect, thus effectively failing to veto any provision. Of course, the Governor also has failed to affirmatively approve HF 692, choosing instead to attempt to item veto some of its provisions.

■ Ultimately, we cannot say with certainty what the Governor would have done if he properly exercised his pocket veto power, which would have permitted him to approve HF 692 as a whole, disapprove it as a whole, or simply allow it to lapse as a whole, effectively disapproving it. *See* Iowa Const. art. III, § 16; *Redmond,* 268 N.W.2d at 851; *Darling,* 67 Iowa at 706–07, 25 N.W. at 889. We can only predict, based on the Governor's transmittal letter sent with HF 692, that, given the option, the Governor would have vetoed the bill as a whole due to his dissatisfaction with several of its provisions. Yet, such a prediction is wholly inappropriate in light of the strict constitutional procedure crafted by our framers to assure the proper passage of laws that have acquired the approval of both the Legislature and the Governor. *See* Iowa Const. art. III, § 16. Moreover, focusing on this prediction would be contrary to the weight of legal authority which indicates that "[i]f the governor's affirmative approval is required, his partial veto, even though invalid, results in the failure of the bill in its entirety." 63C Am.Jur.2d *Public Funds* § 44, at 263; *accord Perry v. Decker,* 457 A.2d 357, 361–62 (Del.1983); *Opinion of the Justices,* 210 A.2d 852, 854–55 (Del. 1965); *Nowell v. Harrington,* 122 Md. 487, 89 A. 1098, 1099–1100 (1914); *Holder,* 23 So. at 645; *Mills v. Porter,* 69 Mont. 325, 222 P. 428, 433 (1924); *State ex rel. Wiseman v. Okla. Bd. of Corrs.,* 614 P.2d 551, 555 (1978); *Regents of State Univ. v. Trapp,* 28 Okla. 83, 113 P. 910, 914 (1911); *Finnegan,* 264 N.W. at 624–25; 82 C.J.S.

*Statutes* § 50, at 81 (1999); Muyskens, 18 Drake L.Rev. at 247–48, 253. For these reasons, we are constrained to conclude that by operation of the Iowa Constitution, no portion of HF 692 became law because the entire bill did not receive the affirmative approval of both the Legislature and Governor before the end of the thirty day period provided the Governor to consider a bill pursuant to the process for consideration of bills passed "during the last three days of a session." Iowa Const. art. III, § 16; *see also Redmond,* 268 N.W.2d at 851; *Darling,* 67 Iowa at 706–07, 25 N.W. at 889.

### VIII. Conclusion.

The district court improperly ruled that the Governor's item vetoes of HF 692 were permissible. In light of this conclusion, we reverse the decision of the district court and remand this case for entry of summary judgment in favor of the Legislature. Underlying this broader conclusion is our conclusion that the Governor acted unconstitutionally in attempting to item veto provisions of HF 692. The result of this unconstitutional action is that the Governor's vetoes are rendered a nullity and ineffective. Moreover, by operation of our constitution, the Governor effectively vetoed the entirety of HF 692 by failing to approve the whole of the bill and return it pursuant to the method prescribed by our constitution when a bill is passed "during the last three days of a session." Iowa Const. art. III, § 16. Ultimately, the result of this case is to render things as though no provision of HF 692 passed into law.

**REVERSED AND REMANDED.**

All justices concur except WIGGINS, J., who concurs in result only.