INTER FACULTY ORGANIZATION, on
Behalf of its organization and members;
et al., petitioners, Respondents,

v.

Arne H. CARLSON, Governor of
Minnesota; et al., Appellants,

Steven A. Cross, Minnesota Revisor of
Statutes, Lower Court Respondent.

No. C4–91–1471.

Supreme Court of Minnesota.

Dec. 20, 1991.

Hubert H. Humphrey, III, Atty. Gen.,
John Tunheim, Asst. Atty. Gen., Peter M.

Ackerberg, Sp. Asst. Atty. Gen., St. Paul, for appellant.

Thomas L. Fabel, Randy G. Gullickson, Lindquist & Vennum, Minneapolis, for respondent.

## OPINION

KEITH, Chief Justice.

We accelerated review of an appeal by Governor Arne Carlson, et al. from an order of the district court granting the petition of Inter Faculty Organization, et al. and issuing a writ of mandamus declaring attempted gubernatorial vetoes to be null and void and without legal effect and compelling the respondents below, in their capacity as constitutional and statutory officials, to perform their various official duties as to legislation without regard to those attempted vetoes. We modify the decision of the district court and affirm.

We first address the procedural posture in which this action arose and was decided. In *The Seventy–Seventh Minnesota State Senate v. Carlson*, 472 N.W.2d 99 (Minn.1991), we defined the procedural avenue by which a challenge to the exercise of the veto power might be asserted. In establishing a uniform procedure applicable to proceedings of this nature, we directed the parties in an unrelated matter to petition the district court for a judicial declaration as to the validity or invalidity of attempted vetoes in accordance with Minnesota Statute chapter 555, the Uniform Declaratory Judgments Act. Inexplicably, this matter nevertheless proceeded on petition for a writ of mandamus.[1] While that petition and the relief it requests are procedurally inappropriate, we nevertheless decline to remand this matter for further proceedings in accordance with Minn.Stat. ch. 555 because of the untoward delay which would result. Instead, we modify the trial court's decision, recasting

it as a judicial declaration that the vetoes were invalid for the reasons set forth in that decision and proceed with our appellate review.

The parties have stipulated to the operative facts. On May 20, 1991, the legislature approved the Higher Education Appropriations Act, Act of June 4, 1991, ch. 356. art. I, 1991 Minn. Laws, ("Act") and presented it to the governor on May 31, 1991. After vetoing nine provisions contained in the Act, only three of which are challenged in these proceedings, Governor Carlson signed the Act on June 4, 1991. In accordance with the constitutional mandate, Minn. Const. art. 4, § 23, the governor appended his veto message explaining among other matters the basis for the subject three vetoes in pertinent part as follows:

The Higher Education line-item vetoes are difficult ones, and, because of the complicated appropriations process employed by the Legislature, the changes cannot be equitably allocated among the individual systems. Nevertheless, the changes are necessary in order to bring the higher education budget closer to my original recommendation.

Veto Message, 1991 Minn. Laws chs. 233, 254, 265, 292, 345, and 356, various items.

The four petitioners are organizations of faculty members of the state university system, the community college system and technical college system, and students attending college in the community college system. The faculty organizations collectively claim injury if the vetoes are upheld, asserting that budget cuts will negatively impact existing educational programs and their ongoing salary negotiations, while the student organization focuses on what it assumes will be the inevitable reduction in educational services with a corresponding increase in tuition costs. They challenge the validity of the purported vetoes, asserting that the governor acted outside the bounds of his constitutional authority, lim-

---

1. In both a technical and practical sense, mandamus will not lie to test the validity or invalidity of an attempted gubernatorial veto, but instead would compel the performance by various

officials of their duties defined as a consequence of that judicial declaration of validity or invalidity.

ited to a veto of "items of appropriation of money." Minn. Const. Art. 4, § 23.

Minn. Const. Art. 4, § 23 provides:

If a bill presented to the governor contains several items of appropriations of money, [the governor] may veto one or more of the items while approving the bill. At the time [the governor] signs the bill the governor shall append to it a statement of the items [the governor] vetoes and the vetoed items shall not take effect.[2]

When interpreting a constitutional provision, we, of course, look first to the specific language of that provision. *State ex. rel. Gardner v. Holm*, 241 Minn. 125, 62 N.W.2d 52 (Minn.1954). In doing so with regard to this item veto authority, two observations are necessary. First, the power is located in Article 4, the Legislative Department Article, demonstrating that the authority is not an executive function in the traditional or affirmative sense, but rather an exception to the authority granted the legislature. As an exception, the power must be narrowly construed to prevent an unwarranted usurpation by the executive of powers granted the legislature in the first instance.

Second, the language of the provision itself limits the authority to the veto of "items of appropriations," not of a part or parts of an item. We therefore view that power as a negative authority, not a creative one—in its exercise the power is one to strike, not to add to or even to modify the legislative strategy.

As a practical matter, the parties do not differ significantly in the definitions of the term "item of appropriation" they ask the court to adopt. The petitioners faculty and students suggest that the term connotes a "specific sum of money which is dedicated to a specific purpose," while the governor proffers the following definition: "provisions in an appropriation bill which are separate and distinct from other provisions in the same bill, insofar as the subject, purpose, or amount of the appropriation is concerned * * *." *State ex rel. Brown v. Ferguson*, 32 Ohio St.2d 245, 252, 291 N.E.2d 434, 438 (1972). We, in Minnesota, find ourselves without a specific definition of the term having a general legislative instruction of a definition as contained in Minn.Stat. § 16A.011, subd. 5 (1990) which defines an "appropriation" as an "authorization by law to expend or encumber an amount in the treasury." Other jurisdictions offer limited guidance in the presentation of definitions similar to those offered by the parties. *See, e.g., Henry v. Edwards*, 346 So.2d 153, 157 (La.1977) ("[T]he word "item" signifies a sum of money dedicated to a specific purpose, a separate fiscal unit."); *People ex rel. State Board of Agriculture v. Brady*, 277 Ill. 124, 131, 115 N.E. 204, 207 (1917) ("The word "item" is in common use and well understood as a separate entry in an account or a schedule, or a separate particular in an enumeration

---

2. The Minnesota Constitution was amended in 1867 to authorize, for the first time, the line item veto. The original provision read as follows:

If any bill presented to the governor contain several items of appropriation of money, [the governor] may object to one or more of such items, while approving of the other portion of the bill. In such case [the governor] shall append to the bill, at the time of signing it, a statement of the items to which [the governor] objects, and the appropriation so objected to shall not take effect.

Minn. Const. art. 4, § 11 (Constitution of 1857 as amended).

In 1915, an amendment was proposed that would have allowed the governor to veto an item of appropriation "in whole or in part." 1915 Minn. Laws. ch. 383, § 1. The amendment failed. Minnesota Legislative Manual (1917).

In 1974, the Minnesota Constitution was restructured in order to improve its clarity and organization. None of the changes was of substantive legal consequence, although the wording of the item veto provision was changed to its present wording.

There are essentially three types of item veto powers in existence throughout the 50 states: The item reduction veto by which a governor is empowered to reduce an item; the amendatory veto by which a governor may return a bill with either recommendations or amendments; and the most restrictive, the item veto by which a governor may delete a specific itemic component or the whole of an appropriation. Minnesota has provided its governor with the item veto.

of a total which is separate and distinct from the other particulars * * * ").

█ It is our responsibility then to define the phrase "item of appropriation" by reference to, and within the context of the Higher Education Appropriations Act, Act of June 4, 1991, ch. 356, art. I, 1991 Minn. Laws. An "item of appropriation of money" is a separate and identifiable sum of money appropriated from the general fund dedicated to a specific purpose. In recognition of the fact that the legislature has not employed a uniform system of appropriation with a consistent format,[3] we confine our decision to the narrow question presented, anticipating that our definition today or its application may well expand or be limited tomorrow, as necessary, on a case-by-case basis.

Specifically at issue are sections 3, 4, and 5 of Act of June 4, 1991, ch. 356, art. I (1991 Minn. Laws), each containing provisions relating to noninstructional expenditures for fiscal year 1993 as to which the governor attempted to exercise the item veto authority. Those sections provide in pertinent part as follows:

Sec. 3. STATE BOARD OF TECHNICAL COLLEGES .

Subdivision 1. Total Appropriation

| [FY] 1992 | [FY] 1993 |
| --- | --- |
| $165,466,000 | $165,061,000 |

The amounts that may be spent from this appropriation for each purpose are specified in the following subdivisions.

Subd. 2. Instructional Expenditures

The legislature estimates that instructional expenditures will be $224,454,000 the first year and $226,179,000 the second year.

    *    *    *    *    *    *

Subd. 3. Noninstructional Expenditures

The legislature estimates that noninstructional expenditures will be $2,092,000 the first year and ~~$1,546,000 the second year.~~

[The strikeout indicates an attempted item veto.]

    *    *    *    *    *    *

Sec. 4. STATE BOARD FOR COMMUNITY COLLEGES

Subdivision 1. Total Appropriation

| [FY] 1992 | [FY] 1993 |
| --- | --- |
| $99,486,000 | $100,747,000 |

The amounts that may be spent from this appropriation for each purpose are specified in the following provisions.

Subd. 2. Instructional Expenditures

The legislature estimates that instructional expenditures will be $135,188,000 the first year and $137,864,000 the second year.

    *    *    *    *    *    *

Subd. 3. Noninstructional Expenditures

The legislature estimates that noninstructional expenditures will be $14,585,000 the first year and ~~$14,585,000 the second year.~~

[The strikeout indicates an attempted item veto.]

    *    *    *    *    *    *

Sec. 5. STATE UNIVERSITY BOARD

Subdivision 1. Total Appropriation

| [FY] 1992 | [FY] 1993 |
| --- | --- |
| $183,134,000 | $179,666,000 |

The amounts that may be spent from this appropriation for each purpose are specified in the following subdivisions.

Subd. 2. Instructional Expenditures

The legislature estimates that instructional expenditures will be $250,201,000

---

3. The legislature has adopted no rules specifying a uniform method by which it appropriates state funds or guidelines for the format of the final enactment. As a result, the governor's scrutiny and exercise of the veto power, as well as judicial review, if any, are complicated. For example, appropriations made to the Higher Education Coordination Board, Act of June 4, 1991, ch. 356, art. I, § 2, 1991 Minn. Laws, take the form of an enumeration of component appropriations, the sum of which equals the "total appropriation" to the Board and the purpose of each is specified; and the appropriations bill dealing with Transportation, Act of June 4, 1991, ch. 233, 1991 Minn. Laws, utilizes a format in which a total appropriation is provided to the Greater Minnesota Corporation with instructions that it spend the amount in accordance with "working papers" placed on file with the Secretary of State. 1991 Minn. Laws ch. 233, § 21, subd. 1.

the first year and $248,917,000 the second year.

\*    \*    \*    \*    \*    \*

Subd. 3. Noninstructional Expenditures
The legislature estimates that noninstructional expenditures will be $14,359,-
000 the first year and ~~$14,359,000 the~~
~~second year.~~

*Id.* [The strikeout indicates an attempted item veto.]

■ A brief examination of the higher education funding scheme is necessary to an understanding of this appropriation legislation. In 1983, the legislature announced its intention to fund from direct state appropriations a portion of the estimated cost of providing instructional services at post-secondary institutions. Minn. Stat. § 135A.01 (1990), of the Public Post–Secondary Education Act. After making student enrollment and cost of instruction assumptions, it projects or estimates the total instructional cost[4] to which it then applies a specified formula for funding a portion of those costs, Minn.Stat. § 135A.03, as to each of the college systems.[5] This average cost funding takes into consideration that student tuition will supply the remainder of the monies necessary for the provision of services.

At the same time, although separate from the Public Post–Secondary Education Act, Minn.Stat. § 135A, the legislature also provides funding for certain noninstructional activities,[6] but by a method other than average cost funding. In this regard, the legislature must anticipate the availability or receipt of other statutory appropriations,[7] known as "flow-through funds," and budget accordingly. The community colleges and state university systems receive noninstructional revenue from both a direct

state appropriation and from flow-through funds charged and collected separately, while the technical college system receives only a direct state appropriation from the general fund.

Taking into account these separate funding strategies and formulae, the legislature then provides to each of the systems' boards what it designates as a "total appropriation" of a specific sum. It seems to us that, both as a practical matter and within the context of this particular budgeting scheme, the "total appropriation" is in fact the "item of appropriation" over which the governor is constitutionally authorized to exercise the item veto. Our construction of this constitutional provision in this context is predicated upon a number of observations and conclusions.

First, the amounts designated as estimated instructional and noninstructional expenditures, while listed separately, are not "identifiable" sums of money. The parties seem to agree that the specific amounts are ascertainable by reference to the so-called "legislative working papers." However, these documents have not been enacted into law or incorporated by reference into the bill itself and we decline to study them or attach any more significance to them other than to comment that they simply manifest the process and analysis of the legislature in making its ultimate budgetary decision. *See, Martinez v. Florida Legislature,* 542 So.2d 358, 362 (Fla.1989). In our view, while the specific sums may well be *ascertainable* by reference to unrecorded documents, they are not *identifiable* from examination of the bill itself.

Second, looking at this problem from another perspective, it is our view that the legislature must have included what it has

---

**4.** "Instructional expenditures" include all costs directly and indirectly attributable to the provision of academic programs, including faculty compensation and that portion of indirect costs traceable to those programs, *e.g.,* library services, student counseling, instructional support, and facility maintenance.

**5.** Direct state appropriations account for 67% of the estimated instructional costs for both the state university system and the community college system and at least 67% of the estimated

instructional costs for the technical college system. Minn.Stat. § 135A.03, subd. 1 (1990).

**6.** "Noninstructional expenditures," those not directly related to credit-granting instruction, include community service, research, inter-collegiate athletics and financial aids and are separate from the process by which tuition is established.

**7.** *See, e.g.,* Minn.Stat. §§ 136.11 and 136.67 (1990).

characterized as "estimates" of instructional and noninstructional expenditures only to demonstrate that it complied with its own announced intention to fund but a portion of the total costs. It is obvious by a simple addition process that the sum of the dollar amounts included in subdivisions 2 and 3 of the respective sections of the appropriation bill do not equal the actual "total appropriation." We therefore cannot conclude that those apparently separate monies are in fact separate "items" of appropriation. At most they can be characterized as only base figures against which the statutory formulae are applied.

Third, these "estimates" do not satisfy the second prong of our definition, that the funds be dedicated to a specific purpose. It is our understanding from the record that each system board is vested with considerable discretion to allocate appropriated monies to the programs and purposes it designates in a manner consistent with broad legislative guidelines.[8] That is, none of the boards is bound by the purported proportional "estimate" to expend a specific amount for either instructional or noninstructional purposes.[9] The appropriations bill itself, by use of the term "may," only suggests a proportionate spending strategy but does not mandate or dedicate the sums mentioned in subdivisions 2 and 3 to a specific purpose.

Thus, in application of the two-part definitional test by which to determine whether an element of an appropriation is an item to which the governor may direct a veto, we declare that the three purported vetoes are null and void and without legal effect. While we recognize that this particular controversy is the product of a clash of political philosophies and strategies over higher educational spending practices of the state, we are also keenly aware that it is not our role to comment on the wisdom of either the appropriations or the exercise of the

item veto. *See generally Starkweather v. Blair,* 245 Minn. 371, 71 N.W.2d 869 (1955).

Affirmed as modified.

GARDEBRING, J., took no part.

---

**8.** *See* Minnesota Higher Education Coordinating Board, *Report to the Governor and 1985 Legislature,* at 89–90.

**9.** An argument may be made that since noninstructional expenditures for the technical colleges are 100% funded by direct appropriation and not by any flow-through funds, that appropriation is separate and identifiable. The funds, however, like those for the other systems, are not dedicated to a specific purpose. Under those circumstances, the technical college system veto is not distinctive.