Douglas J. JOHNSON, et al., Respondents,

v.

Arne H. CARLSON, Governor of Minnesota, et al., Petitioner, Appellants.

No. C2–92–1429.

Supreme Court of Minnesota.

Oct. 15, 1993.

Hubert H. Humphrey, III, Atty. Gen., Richard S. Slowes, Asst. Sol. Gen., St. Paul, for appellants.

Thomas L. Fabel, Randy G. Gullickson, Minneapolis, for respondents.

SIMONETT, Justice.

We conclude the governor's line item veto in this case was properly and constitutionally invoked and reverse the contrary ruling of the court of appeals.

This declaratory judgment action challenges the constitutionality of Governor Arne H. Carlson's veto of a 1991 law assigning revenue from a taconite tax increase to a new higher education program on Minnesota's Iron Range. Plaintiff-respondents are parties having an interest in the higher education program.[1] Defendants are the governor and the current commissioner of the Iron Range Resources and Rehabilitation Board ("Resources Board").

The district court, on summary judgment motions, upheld the constitutionality of the governor's veto. The court of appeals disagreed and reversed, *Johnson v. Carlson,* 494 N.W.2d 516 (Minn.App.1993), and we granted the governor's petition for further review.

Chapter 298 of the Minnesota Statutes (1992) sets out a tax on the production of taconite and iron sulfides. Minn.Stat. § 298.-24. This tax revenue is distributed for various purposes among the various governmental units in the Iron Range region, *id.,* § 298.28; the remaining tax proceeds are routed under a "residuary provision," *id.,* § 298.28, subd. 11, to two special programs of

---

1. Plaintiffs are Senator Douglas J. Johnson, former Senator Ronald R. Dicklich and former Representative Joseph R. Begich, all of whom represented districts in the Iron Range region in 1992; the Range Association of Municipalities and Schools, which promotes legislation benefitting its members; the Inter Faculty Organization, members of which promote higher education concerns on the Iron Range; and Cynthia MacLeod and David Jay Wagner, both of whom are Iron Range residents enrolled in bachelor degree programs.

the Resources Board, namely the Northeast Minnesota Protection Trust Fund ("Economic Trust Fund") and the Taconite Environmental Protection Trust Fund ("Environmental Trust Fund"). The Commissioner of Revenue has control over the collection and payment of the taconite tax. *Id.*, § 298.27.

In 1990, the Minnesota Legislature increased the taconite tax rate for concentrates produced in 1991 and subsequent years. Minn.Stat. § 298.24, subd. 1(b) (1990).[2] Under the residuary provision already in place, the revenue from the tax increase would go to the two trust funds above mentioned.

The next year, 1991, the legislature included in its Higher Education Appropriations Act two provisions for higher education on the Iron Range.[3] The first provision (known as Section 1) created a committee to advise the commissioner of the Resources Board on a contract with the state university system for higher education in the taconite tax relief area, and authorized the commissioner to enter into a higher education services contract with the state university system.[4]

We now reach the provision vetoed by the governor. This provision, providing funding for the higher education services contract, reads as follows:

> In 1992 and 1993, the amount of tax attributable to the rate increase under section 298.24, subdivision 1, paragraph (b), since production year 1990, shall be paid to the commissioner of iron range resources and rehabilitation to be used to pay the cost of providing higher education services in the taconite tax relief area under the contract provided for in section 1.

Ch. 356, art 4, § 5, 1991 Minn.Laws 2895 (hereinafter referred to as "Section 5").

On June 4, 1991, Governor Carlson lined out "Section 5, page 32, lines 16 through 22, an appropriation to a commissioner." Gov. Veto Message, 3 Sen.J. 5562 (1991). The issue before us, then, is whether this veto was constitutional, or to put it another way, was the veto of Section 5 the veto of an "item of appropriation of money"?[5]

We recently had occasion to consider the gubernatorial line item veto in *Inter Faculty Organization v. Carlson*, 478 N.W.2d 192 (Minn.1991), where we held that the governor's veto of an estimated sum for noninstructional expenditures (which included unspecified flow-through funds) was ineffective because the bill itself did not identify any specific amount. "An 'item of appropriation of money'," we said, "is a separate and identifiable sum of money appropriated from the general fund dedicated to a specific purpose." *Id.* at 195. We stated that this definition or its application "may well expand or be limited tomorrow, as necessary, on a case-by-case basis." *Id.* While noting that the constitution expressly provided for the executive veto of legislative action, we cautioned that this veto power was to be narrowly construed so as not to exceed its limited function as contemplated by the constitution. *Id.* at 194.

Plaintiff-respondents challenge the governor's veto on three main grounds: First, the veto does not affect an item of appropriation because it does not reduce government spending or destroy any fund or appropriated amount; second, the amount of money sought to be vetoed is not identifiable from the bill itself; and third, public policy and fairness require that the taconite tax revenue, like the local property taxes it supplants, not be subject to a gubernatorial veto.

Dealing with plaintiffs' second argument first, we hold that Section 5 satisfies the constitutional requirement of a "separate and identifiable sum of money." This is a func-

---

2. In 1992, the legislature amended subd. 1(b) of section 24 by changing the phrase "1991 and subsequent years" to "1994 and subsequent years." Act of April 24, 1992, ch. 511, art. 9, § 9, 1992 Minn.Laws 812.

3. Act of June 4, 1991, ch. 356, art. 4, § 1, 1991 Minn.Laws 2892, codified as Minn.Stat. § 298.-2214 (1992).

4. The composition of the committee is codified in Minn.Stat. § 298.2214, subd. 2 (1992). The commissioner's authority to enter into a contract with the state university system, subject to prior review and approval by the committee, is set out in Minn.Stat. § 298.2214, subd. 4 (1992).

5. "If a bill presented to the governor contains several items of appropriation of money, he may veto one or more of the items while approving the bill." Minn. Const. art. 4, § 23.

tional test and does not necessarily require that the legislation express a numerical sum if that sum is readily identifiable from the terms of the bill itself. Here Section 5 identifies the money involved as "the amount of tax attributable to the rate increase * * * since production year 1990," no more, no less.

Next, we conclude that Section 5 is an "appropriation." The funds are for a specific purpose, namely, to pay the cost of providing higher education services under the contract with the state university system. Plaintiff-respondents argue, and the court of appeals agreed, that Section 5 involved only a "transfer" of funds, not an appropriation. We fail to see the distinction here. Section 5 commits the taconite tax increase to the higher education program; the fact that this commitment means the money will not go into the Economic Trust Fund and the Environmental Trust Fund as it otherwise would under the residuary provision does not make the commitment under Section 5 any less an appropriation. For the higher education services contract to be implemented, it must be funded by an appropriation of money, and this is precisely what Section 5 does. *See United States Fire Ins. Co. v. Minnesota Zoological Bd.,* 307 N.W.2d 490, 496 (Minn. 1981) (a state agency cannot incur contractual obligations unless funds have been appropriated for such purpose).

Plaintiff-respondents point to language in *Inter Faculty* where we said that the veto power is a "negative authority," *i.e.,* a power "to strike, not to add to or even to modify the legislative strategy." 478 N.W.2d at 194. Plaintiffs argue that the effect of the veto in this case is to divert money from a purpose determined by the legislature to some other purpose desired by the governor, thus modifying the legislative strategy. They also argue, again relying on the "negative authority" language, that a veto must reduce government spending. These arguments, we think, misconceive the role of the line item veto.

The reference to the veto as a negative power must be understood, as we stated in *Inter Faculty,* within the context of the requirement that the veto act on an *item* of appropriation, not a "part or parts of an item." *Id.* This statement becomes clear if we look at *Rush v. Ray,* 362 N.W.2d 479 (Iowa 1985). There, Iowa Code § 8.39 authorized the governor to transfer funds from one department or agency to another. The Iowa Legislature then passed five appropriation bills, adding to each the proviso, "notwithstanding section eight point thirty-nine (8.39) of the Code, funds appropriated by this Act shall not be subject to transfer or expenditure for any purpose other than the purposes specified." 362 N.W.2d at 480. The governor vetoed the proviso. The Iowa Supreme Court held the veto ineffective because it vetoed a qualification imposed on the appropriation, not the appropriation itself as an entire item; the effect of the veto was affirmatively to create new uses for the appropriated funds as the governor, not the legislature, saw fit. *Id.* at 483. Our case is quite different from the Iowa case. Here Section 5 is a self-contained appropriation of a distinct sum for a specific purpose, and the governor's veto is a veto of that whole "item."

Plaintiff-respondents also argue that a line item veto must result in a reduction in spending, and by this they apparently mean a reduction in overall government spending. By its very nature, of course, the veto of an item of appropriation of money results in that money not being spent for the purpose for which it was appropriated. It would seem that the constitution does not expect more. Here, while the veto of Section 5 may not reduce overall spending, it does result in a reduction in the budget for higher education.

Finally, plaintiff-respondents argue that the taconite tax is unique; that it is, in effect, a local tax intended for local purposes; and, indeed, that it is constitutionally established "in lieu" of other forms of taxation on real or personal property, to be used within the "taconite tax relief area." *See* Minn.Const. art. 10, § 6; Minn.Stat. § 298.25 (1992). The fact remains, however, that the taconite tax is a state-imposed tax, not a local tax, controlled in part by the Resources Board which itself is a state agency. The monies raised by the tax, while they may not go into the general fund, are public revenues of the state, so that expenditure of these revenues

is subject to the appropriation process of the state legislature and, consequently, subject also to the line item veto.

Historically, the line item veto was put in state constitutions to counteract legislative "pork-barreling," the practice of adding extra items to an appropriation bill which the governor could not veto without vetoing the entire appropriation bill. *See, e.g., Rios v. Symington,* 833 P.2d 20, 23 (Ariz.1992). Our inquiry, however, is not into whether "pork-barreling" has occurred—indeed, Governor Carlson makes no claim that it has occurred in this case; rather, our focus is simply on whether Governor Carlson has vetoed an "item of appropriation of money." The state constitution, recognizing the governor's oversight responsibilities for the state's budget, provides a gubernatorial line item veto to enable the state's chief executive officer to engage in cost-containment, subject, of course, to the possibility of the veto being overturned. In this case, for example, the governor indicated in his veto message that he was concerned with "long-term cost implications." 3 Sen.J. 5560 (1991). It is not for this court to judge the wisdom of a veto, or the motives behind it, so long as the veto meets the constitutional test. And in this case the test is met.

We conclude, therefore, that the governor's veto of Section 5 is a valid exercise of his constitutional line item veto authority.

Reversed.

GARDEBRING, J., took no part in the consideration or decision of this case.