# IN THE SUPREME COURT OF IOWA

No. 11–2022

Filed March 16, 2012

**DANNY HOMAN, WILLIAM A. DOTZLER, JR., BRUCE HUNTER, DAVID JACOBY, KIRSTEN RUNNING-MARQUARDT,** and **DARYL BEALL,**

Appellees,

vs.

**TERRY E. BRANSTAD,** Governor of the State of Iowa,

Appellant.

---

Appeal from the Iowa District Court for Polk County, Bradley McCall, Judge.

The parties appeal the district court's summary judgment ruling on the constitutionality of certain item vetoes exercised by the Governor on an appropriations bill. **SUMMARY JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED.**

Richard J. Sapp and Ryan G. Koopmans of Nyemaster, Goode, West, Hansell & O'Brien, P.C., Des Moines, for appellant.

Mark T. Hedberg, Nathaniel R. Boulton, and Erin G. Benoy of Hedberg & Boulton, P.C., for appellees.

**WATERMAN, Justice.**

This appeal requires our court to resolve another dispute between the executive and legislative branches of our state government over the scope of the Governor's item veto power.[1]  On July 27, 2011, Governor Terry E. Branstad item vetoed several provisions in Senate File 517, an appropriations bill passed in the final days of the Eighty-fourth General Assembly.  Primarily at issue is $8.66 million the legislature appropriated in section 15(3) for the operation of Iowa Workforce Development (IWD) field offices.  The Governor, without vetoing that appropriation, item vetoed section 15(3)(c), prohibiting the closure of field offices, and section 15(5), defining "field office" to require the presence of a staff person.  His accompanying item-veto message noted his purpose was to provide "enhanced benefits through maximum efficiencies" by replacing staffed field offices with numerous additional "virtual access point [computer] workstations" for the delivery of employment services to Iowans throughout our state.  The Governor also item vetoed section 20, which restricts IWD from spending any appropriated funds on the National Career Readiness Certificate Program, without item vetoing any of the several appropriations to IWD in Senate File 517.  And, the Governor item vetoed similar provisions in the bill for the following fiscal year.

We must decide whether the Governor's item vetoes comply with article III, section 16 of our state constitution, the item-veto amendment ratified by the people of Iowa in 1968.  Plaintiffs, Danny Homan, the

---

[1]Our court previously decided the constitutionality of particular item vetoes in *Rants v. Vilsack*, 684 N.W.2d 193 (Iowa 2004); *Welsh v. Branstad*, 470 N.W.2d 644 (Iowa 1991); *Junkins v. Branstad*, 448 N.W.2d 480 (Iowa 1989); *Colton v. Branstad*, 372 N.W.2d 184 (Iowa 1985); *Rush v. Ray*, 362 N.W.2d 479 (Iowa 1985); *Welden v. Ray*, 229 N.W.2d 706 (Iowa 1975); and *State ex rel. Turner v. Iowa State Highway Comm'n*, 186 N.W.2d 141 (Iowa 1971), *abrogated in part by Rants*, 684 N.W.2d at 210.

president of Iowa Council 61 of the American Federation of State County and Municipal Employees, a state-employee union, and William A. Dotzler, Jr., Bruce Hunter, David Jacoby, Kirsten Running-Marquardt, and Daryl Beall, legislators in the Eighty-fourth General Assembly, filed this action in district court alleging the Governor unconstitutionally item vetoed "conditions or restrictions" on the appropriations. On December 8, the district court entered a split decision that upheld the item veto of section 20, but declared invalid the item veto of sections 15(3)(c) and 15(5). Both sides appealed, and we granted expedited review.

This is not an easy case. The legislature failed to use language in section 15(3) expressly conditioning the $8.66 million appropriation on the restrictions against closing staffed field offices. Nonetheless, we conclude the definition of "field office" in section 15(5) qualifies or restricts the $8.66 million appropriation in section 15(3)(b) "for the operation of field offices." Accordingly, the Governor could not veto section 15(5) without vetoing the accompanying appropriation in section 15(3). We further conclude the Governor impermissibly item vetoed the restriction in section 20 on use of IWD appropriations for the national certificate program.

Simply stated, the legislature appropriated funds to IWD with strings attached, and our constitution does not permit the Governor to cut the strings and spend the money differently. The required remedy is to invalidate the following sections of Senate File 517: sections 15, 17, 18, 19, and 20 of division I and sections 61, 63, 64, 65, and 66 of division IV. The other sections of Senate File 517 affirmatively approved by the Governor remain in effect as enacted. In light of this remedy, we need not decide the validity of the Governor's item veto of section 15(3)(c).

## I.  Background Facts and Proceedings.

The Eighty-fourth General Assembly of Iowa passed Senate File 517, "The Economic Development Appropriations Bill," on June 27, 2011.  The bill was sent to Governor Branstad three days later, on the last day of the legislative session.  Senate File 517 begins with this description:

> An act relating to and making appropriations to the department of cultural affairs, the department of economic development, certain board of regents institutions, the department of workforce development, the Iowa finance authority, and the public employment relations board, and addressing related matters including tax credits and including immediate effective date and retroactive applicability provisions.

All parties agree Senate File 517 is an appropriations bill.

Appropriations and provisions relating to IWD are found in division I, sections 15 through 20 of Senate File 517 for the fiscal year July 1, 2011, to June 30, 2012.[2]  On July 27, Governor Branstad item vetoed sections 15(3)(c) and 15(5), as follows:

> Sec.    15. DEPARTMENT    OF    WORKFORCE DEVELOPMENT.   There is appropriated from the general fund of the state to the department of workforce development for the fiscal year beginning July 1, 2011, and ending June 30, 2012, the following amounts, or so much thereof as is necessary, for the  purposes designated:
>
> . . . .
>
> 3.  WORKFORCE DEVELOPMENT OPERATIONS
>
> a. For the operation of field offices, the workforce development board, and for not more than the following full-time equivalent positions:
>
> ..................................................................... $8,671,352
> ..............................................................FTEs   130.00

---

[2]Identical language for the next fiscal year is found in division IV, sections 61 to 66.  Our analysis will discuss sections 15 through 20 of division I, but that analysis and our ruling apply equally to sections 61 to 66 of division IV.

b. Of the moneys appropriated in paragraph "a" of this subsection, the department shall allocate $8,660,480 for the operation of field offices.

c. The department shall not reduce the number of field offices below the number of field offices being operated as of January 1, 2009.

. . . .

5. DEFINITIONS

For purposes of this section:

a. "Field office" means a satellite office of a workforce development center through which the workforce development center maintains a physical presence in a county as described in section 84B.2. For purposes of this paragraph, a workforce development center maintains a physical presence in a county if the center employs a staff person. "Field office" does not include the presence of a workforce development center maintained by electronic means.

b. "Workforce development center" means a center at which state and federal employment and training programs are colocated and at which services are provided at a local level as described in section 84B.1.

Governor Branstad's transmittal letter to Secretary of State Schultz explained:

> I am unable to approve the item designated Section 15, subsection 3, paragraph c, in its entirety. This item would prohibit Iowa Workforce Development ("IWD") from putting forth an enhanced delivery system that broadens access to Iowans across the state in fiscal year 2012. In order to develop a sustainable delivery system, in light of continually fluctuating federal funding, the department must put forth a system that embraces the use of technology while providing enhanced benefits through maximum efficiencies. At this time, IWD has over one hundred ninety virtual access point workstations in over sixty new locations throughout the state in order to increase access to these critical services. Iowans are already utilizing expanded hours of operations, six days a week. At my direction, IWD will have hundreds of additional virtual access points by the end of fiscal year 2012.
>
> I am unable to approve the item designated as Section 15, subsection 5 in its entirety. This item attempts to define a delivery system in such a way as to prevent growth and progress in serving Iowans in fiscal year 2012. IWD has recognized the necessity of delivering services through

multiple streams, including technology. As such, IWD is putting forth a plan that delivers more services to Iowans while streamlining government.

Sections 17, 18, and 19 appropriated additional funds to IWD. Section 20 restricts IWD from using appropriated funds for the National Career Readiness Certificate Program. Governor Branstad item vetoed section 20 as follows:

> ~~Sec. 20. APPROPRIATIONS RESTRICTED. The department of workforce development shall not use any of the moneys appropriated in this division of this Act for purposes of the national career readiness certificate program.~~

The Governor's transmittal letter to Secretary Schultz explained:

> I am unable to approve the item designated as Section 20 in its entirety. This item would prohibit IWD from using the National Career Readiness Certificate program in fiscal year 2012. The National Career Readiness Certificate program is an Iowa-based product which is an assessment and skill development tool that has been embraced by over 400 Iowa employers as an exceptional tool for demonstrating skills for a potential employee. It is nationally recognized by both the Executive Office of the President and the U.S. Department of Labor as a reliable and portable tool for job seekers to present and certify their skills. I cannot agree with the denial to IWD of the potential use of this program.

Plaintiffs commenced this action in district court on August 24. They alleged these item vetoes exceeded Governor Branstad's constitutional authority and sought a declaratory ruling the vetoes were void and that Senate File 517 became law as presented to the Governor. On September 20, plaintiffs moved for summary judgment. They argued the vetoed provisions were "conditions and restrictions on appropriations" that could not be item vetoed apart from "the accompanying appropriations." Plaintiffs asked for a declaratory ruling that each attempted item veto is "unconstitutional, illegal, null, [and] void." Plaintiffs also changed their position on the remedy to seek a

ruling that no provision of Senate File 517 became law. Governor Branstad cross-moved for summary judgment. The Governor asked the district court to rule "the item vetoes exercised were constitutional."

On December 8, the district court entered its decision. It ruled that sections 15(3)(c) and 15(5) were conditions that could not be vetoed apart from the appropriations in section 15. The district court concluded "[t]he prohibition against reducing the number of field offices was inseparably connected to the appropriation." It further determined that the "field office" definition qualified the field office appropriation. The district court, however, ruled that Governor Branstad properly vetoed section 20 because it was "overly broad" and "therefore must be considered to be a rider." As to the remedy, the district court concluded Senate File 517 "became law as if [Governor Branstad] had not exercised the item vetoes . . . determined to be invalid."

All parties appealed, and we granted expedited briefing and argument. The Governor argues on appeal that the district court erred in holding Senate File 517 sections 15(3)(c) and 15(5) could not be vetoed apart from the appropriations in section 15. Plaintiffs argue the district court erred in holding section 20 was a stand-alone "item" subject to veto. We heard televised oral arguments on the evening of February 21.

## II. Standard of Review.

Whether the Governor properly exercised his item veto power " 'is an issue of constitutional analysis which presents a question of law for the courts.' " *Rants v. Vilsack*, 684 N.W.2d 193, 199 (Iowa 2004) (quoting *Junkins v. Branstad*, 448 N.W.2d 480, 482 (Iowa 1989)). Summary judgment is the appropriate vehicle to resolve this legal question. *Id.*; *Welsh v. Branstad*, 470 N.W.2d 644, 647 (Iowa 1991) ("[T]he ultimate question of whether the excised portion was subject to item veto is

always a question of law."). We review de novo the district court's summary judgment ruling on questions of constitutional law. *See Ames Rental Prop. Ass'n v. City of Ames,* 736 N.W.2d 255, 258 (Iowa 2007) ("We review constitutional claims de novo" to determine whether the district court correctly applied the law on summary judgment.); *Rants,* 684 N.W.2d at 199–200.

### III. Analysis.

"Our opinion concerning the wisdom of either the original enactment[] or the vetoes does not enter into our judicial evaluation of the legality of the Governor's action." *Rush v. Ray,* 362 N.W.2d 479, 480 (Iowa 1985). The elected branches decide how best to deliver employment services to Iowans; our role as the third branch is to decide this constitutional case.

The Governor's item-veto power is set forth in article III, section 16 of the Iowa Constitution, which provides in pertinent part:

> *The governor may approve appropriation bills in whole or in part, and may disapprove any item of an appropriation bill*; and the part approved shall become a law. Any item of an appropriation bill disapproved by the governor shall be returned, with his objections, to the house in which it originated, or shall be deposited by him in the office of the secretary of state in the case of an appropriation bill submitted to the governor for his approval during the last three days of a session of the general assembly, and the procedure in each case shall be the same as provided for other bills. Any such item of an appropriation bill may be enacted into law notwithstanding the governor's objections, in the same manner as provided for other bills.

(Emphasis added.)

In construing the item-veto provision, our mission " 'is to ascertain the intent of the framers.' " *Rants,* 684 N.W.2d at 199 (quoting *Junkins,* 448 N.W.2d at 483). We thoroughly reviewed the history of the item-veto

power and authorities illuminating the boundaries of that power in *Rants*. *Id.* at 200–06.

"[T]he purpose of the item veto provision of our constitution [is to] give[] the governor a larger role in the state budgetary process." *Junkins*, 448 N.W.2d at 484 (citing *Colton v. Branstad*, 372 N.W.2d 184, 192 (Iowa 1985)). In *Rants*, we further observed "the item veto power developed 'to control logrolling, or the legislators' practice of combining in a single bill provisions supported by various minorities in order to create a legislative majority.'" 684 N.W.2d at 201 (quoting Richard Briffault, *The Item Veto: A Problem in State Separation of Powers*, 2 Emerging Issues in St. Const. L. 85, 87 (1989) [hereinafter Briffault]); *see also Johnson v. Carlson*, 507 N.W.2d 232, 235 (Minn. 1993) ("Historically, the line item veto was put in state constitutions to counteract legislative 'pork-barreling,' the practice of adding extra items to an appropriation bill which the governor could not veto without vetoing the entire appropriation bill." (citing *Rios v. Symington*, 833 P.2d 20, 23 (Ariz. 1992))).

"[T]he item veto power grants the governor a limited legislative function in relation to appropriation bills." *Rants*, 684 N.W.2d at 202. " '[W]hatever the veto's successes in dealing with budget problems, by empowering the executive to veto a part of a bill, the item veto opens up a set of knotty legal and conceptual difficulties.'" *Id.* (quoting Briffault, 2 Emerging Issues in St. Const. L. at 86).

Defining the scope of an "item" subject to veto has proven difficult. " 'We must first look at the words employed, giving them meaning in their natural sense and as commonly understood.'" *Junkins*, 448 N.W.2d at 483 (quoting *Redmond v. Ray*, 268 N.W.2d 849, 853 (Iowa 1978)). By its terms, article III, section 16 permits the Governor to "disapprove any

item of an appropriation bill." "This language—particularly the term 'item'—has caused this court and other courts their greatest interpretive difficulty." *Rants*, 684 N.W.2d at 205. Separate policy items placed in an appropriation bill may be the subject of item veto—the item itself need not appropriate money. *Id.* ("Thus in [*State ex rel.*] *Turner* [*v. Iowa State Highway Commission*, 186 N.W.2d 141 (Iowa 1971),] and subsequent cases, we have acknowledged the governor may constitutionally veto nearly any item in an appropriation bill even if that item is not a monetary allocation.").

In *Welden v. Ray*, however, we held "that if the Governor desires to veto a legislatively-imposed qualification upon an appropriation, he must veto the accompanying appropriation as well." 229 N.W.2d 706, 713 (Iowa 1975). We have used the terms "proviso," "restriction," "qualification," "limitation," and "condition" interchangeably to "denote[] 'a provision in a bill that limits the use to which an appropriation may be put.' " *Rants*, 684 N.W.2d at 205 n.3 (quoting *Colton*, 372 N.W.2d at 189). The point is this: when the legislature makes a specific appropriation for a specific purpose, the Governor can veto the appropriation as an item, but cannot veto the purpose and use the appropriation for a different purpose. We must decide whether the provisions vetoed by Governor Branstad in Senate File 517 are separate items subject to veto, or rather, conditions or qualifications upon an item of appropriation that could not be vetoed without vetoing the appropriation.

**A. The Validity of the Item Veto of Section 15(3)(c).** Governor Branstad makes a strong argument that his item veto of the provision prohibiting closure of field offices in section 15(3)(c) is valid under *Turner*. 186 N.W.2d 141. Section 15(3)(c) states, "The department [IWD] shall

not reduce the number of field offices below the number of field offices being operated as of January 1, 2009." *Turner* is closely analogous. During the 1969 legislative session, the state highway commission requested $80,000 to move forty-eight engineers' offices. *Id.* at 149. The legislature passed a highway commission appropriation bill with a section 5 that stated:

> "The permanent resident engineers' offices presently established by the State Highway Commission shall not be moved from their locations; however, the commission may establish not more than two temporary resident engineers' offices within the state as needed."

*Id.* at 143 (quoting H.F. 823, 63rd G.A., 1st Sess. ch. 30 § 5 (1969)).

Governor Ray used the newly enacted item-veto amendment to strike section 5 from the bill, while leaving the highway commission appropriation intact. *Id.* Governor Ray's item-veto message stated:

> My action is based on the following: The function of the Highway Commission is to construct and maintain roads and highways in the State of Iowa in the most efficient and effective manner possible.
>
> Restricting the location or relocation of resident engineers' offices will inhibit the commission's efforts to operate at maximum efficiency.
>
> Mr. Joseph R. Coupal, director of highways, estimates that this restriction could cost the State of Iowa an estimated $100,000 during the biennium.

*Id.* (internal quotation marks omitted). In the ensuing litigation, several legislators challenged Governor Ray's item veto as unconstitutional, contending that section 5 was a "restriction, condition or limitation upon an appropriation" not subject to item veto. *Id.* at 148–49. We disagreed and held that section 5 was a separate "item" subject to veto. We noted the absence of any expressly conditional language in section 5, in contrast to the preceding section that contained an explicit restriction:

> We feel a comparison of section 5, which is set out in full above, with the foregoing section 4 is of more than passing interest. Section 4 provides,
>
>> No moneys appropriated by this act shall be used for capital improvements, but may be used for overtime pay of employees involved in technical trades.
>
>> It should be noted section 5 places no prohibition against the use of any moneys appropriated by the act for the moving of permanent resident engineers' offices presently established by the defendant commission. Had such language as used in section 4 been employed in section 5 we are impelled to the view that section 5 would have in such case been a proviso or condition upon the expenditure of the funds appropriated, but lacking such phraseology it obviously is not.

*Id.* at 150 (internal quotation marks omitted).

In concluding that section 5 was a separate "item" subject to veto, we emphasized that the provision "did not 'qualify an appropriation' or 'direct the method of its use' and is in no sense a condition, qualification or proviso which limits the expenditure of any of the funds appropriated by House File 823." *Id.* Governor Branstad argues the same description fits section 15(3)(c) of Senate File 517. Viewed in isolation, section 15(3)(c) contains no conditional language or prohibition against the use of money, and makes no reference to any appropriation. We presume the Eighty-fourth General Assembly was aware of our decision in *Turner*. *See Welch v. Iowa Dep't of Transp.*, 801 N.W.2d 590, 600 (Iowa 2011) (" 'The legislature is presumed to know the state of the law, including case law, at the time it enacts a statute.' " (quoting *State v. Jones*, 298 N.W.2d 296, 298 (Iowa 1980))). One of the lessons of *Turner* is that, if the legislature expects judicial intervention to be available when the Governor attempts to excise limitations or qualifications on appropriations through an item veto, the legislature must provide the court with *clear language* establishing the necessary legal foundation. In other words, if the legislature wants to condition or limit an

appropriation, it should expressly say so. *See Turner*, 186 N.W.2d at 153 (intent to make language a "condition, restriction or proviso" should be "accomplished by specific draftsmanship").

Indeed, the Eighty-fourth General Assembly did use express language in section 20 restricting the use of appropriations to IWD: "APPROPRIATIONS RESTRICTED. [IWD] shall not use any of the moneys appropriated in this division of this Act for purposes of the national career readiness certificate program." The omission of such express "phraseology" from section 15(3)(c) permits an inference that the legislature had not intended it to qualify or direct the use of the appropriation for the operation of field offices. This lack of conditional language or an overt reference to an appropriation, however, might be explained by the juxtaposition of section 15(3)(c) with the immediately preceding section 15(3)(b) that contains the appropriation "for the operation of field offices." Both are subsections within section 15(3). In *Turner*, the vetoed language was not the very next sentence after the appropriation. The proximity, combined with the definition in section 15(5) (requiring the physical presence of a staff person), arguably allows an inference that the appropriation for the operation of field offices is conditioned upon the directive not to reduce the number of them. Uncertainty over the legislature's intent could have easily been avoided by the addition of expressly conditional language.

Ultimately, we need not decide whether section 15(3)(c) constitutes a separate "item" subject to veto because, for the reasons that follow, we hold section 15 as a whole fails.

**B. The Validity of the Item Veto of Section 15(5).** We next address whether the Governor constitutionally could item veto the definition of "field office" in section 15(5) without vetoing the $8.66

million appropriation "for the operation of field offices" in section 15(3)(b). *Turner* did not involve a definition included in the same section of the bill as the appropriation. The Governor argues that section 15(5) is a separate item subject to veto. The district court ruled this item veto was unconstitutional, stating:

> Read in the context in which they were enacted, the legislative limitations embodied in the definitions contained in the vetoed provisions were clearly intended by the legislature to apply directly to the funds appropriated "for the operation of field offices." With the use of the phrase "in this section" the legislature evinced an intent to place restrictions on the use of the appropriations it made earlier in the section.

We agree. Section 15(5), entitled "DEFINITIONS," begins by stating, "For purposes of this section . . . ." The provision then defines "field office" as requiring the physical presence of an employee at each field office. This definition applies throughout section 15 and, thus, controls the meaning of "field office" in section 15(3)(b), which appropriates $8.66 million "for the operation of field offices." The legislature textually linked section 15(5) to the appropriation in section 15(3). Reading the provisions together, as the legislature directed, makes clear that each "field office" funded in section 15(3)(b) is to be staffed with an IWD employee. That is, a location with a computer workstation but no employee physically present is not a "field office" within the meaning of the appropriation provision.

We have cautioned the item veto cannot be used to strike a provision that is "inextricably linked" to or an "integral part" of an appropriation. *Colton*, 372 N.W.2d at 190; *Welden*, 229 N.W.2d at 714. We see these provisions as inseparable and inextricably linked. The funds appropriated for field offices were for those defined in section 15(5) to require the physical presence of a staff person. The definition of "field

office" is an integral part of the appropriation for the operation of field offices. Definitions can impose conditions; this one did. The $8.66 million appropriation had strings attached, tying the funds to the requirement that state employees staff the field offices. The fiscal wisdom of this requirement is not for our court to decide. But our constitution does not permit the Governor to cut the strings and keep the money.

> In *Rants*, we reiterated the following admonition:
>
> [I]f the removal of the provision would permit the governor to "legislate by striking qualifications [on appropriations] in a manner which distorts legislative intent" or to "divert money appropriated by the legislature for one purpose so that it may be used for another," we consider it an inseparable statement of the legislature's will, impervious to an item veto unless both the condition and the appropriation to which it is related are item vetoed together. *Rush,* 362 N.W.2d at 482 ("The vetoed language created conditions, restricting the use of the money to the stated purpose. It is not severable, because upon excision of this language, the rest of the legislation is affected.") . . . .

684 N.W.2d at 206. To allow the Governor to veto the definition in section 15(5) without vetoing the accompanying appropriation in section 15(3)(b) would impermissibly "distort[] legislative intent" or "divert money appropriated by the legislature for one purpose so that it may be used for another." *Rush,* 362 N.W.2d at 482. Specifically, the Governor would be disregarding the express legislative direction requiring staffed field offices and diverting the money appropriated for a different purpose—unmanned computer kiosks. We conclude section 15(5) is impervious to an item veto without a veto of section 15(3).

We therefore hold the Governor's item veto of section 15(5) was unconstitutional.

**C. The Validity of the Item Veto of Section 20.** We now turn to the cross-appeal. The district court upheld the validity of Governor Branstad's item veto of section 20, which states:

> Sec. 20. APPROPRIATIONS RESTRICTED. The department of workforce development shall not use any of the moneys appropriated in this division of this Act for purposes of the national career readiness certificate program.

The district court ruled that section 20 is a rider subject to item veto:

> Although this provision places explicit qualifications and limitations on the use of the appropriated funds, it is overly broad in the appropriated funds to which it is attached. It therefore must be considered to be a rider, and not an item, for item veto analysis purposes. Accordingly, Governor Branstad's item vetoes of Division I, Section 20 and of Division IV, Section 66, were effective and should be upheld.

We disagree. We have cautioned the legislature cannot tie unrelated provisions in a bill together to frustrate the Governor's item-veto power. *Colton,* 372 N.W.2d at 192. But, the fact IWD received appropriations through four different provisions of Senate File 517, specifically sections 15, 17, 18, and 19, does not make the express restriction on use of the money in section 20 overly broad or a rider subject to item veto.[3] A

---

[3]IWD received a fifth appropriation in division I, section 24 entitled "Unemployment Compensation Program":

> Notwithstanding section 96.9, subsection 4, paragraph "a", moneys credited to the state by the secretary of the treasury of the United States pursuant to section 903 of the Social Security Act are appropriated to the department of workforce development and shall be used by the department for the administration of the unemployment compensation program *only.* This appropriation shall not apply to any fiscal year beginning after December 31, 2011.

(Emphasis added.) The legislature restricted the appropriation in section 24 for the use of the "unemployment compensation program only." IWD cannot use the funds appropriated in section 24 for the National Career Readiness Certificate Program. Accordingly, section 20 is not a condition that restricts or qualifies section 24. Division IV, section 70 mirrors the appropriation in section 24 for the next fiscal year.

"rider" is "an unrelated substantive piece of legislation incorporated in the appropriation bill." *Id.* at 191. Section 20 is not "unrelated" to the IWD appropriations. To the contrary, section 20 explicitly restricts the use of IWD's appropriations, and that is all it does.

"Inherent in the power to appropriate is the power to specify how the money shall be spent." *Welden*, 229 N.W.2d at 710. This power "may be couched in the negative." *Id.* We have held provisions restricting executive branch agencies from spending appropriated money for nonspecified purposes are conditions not subject to independent veto. *Rush*, 362 N.W.2d at 482–83. Section 20 precludes IWD from spending any of its appropriations on the national certificate program. Without this restriction, IWD could transfer funds appropriated for another purpose to the program. Iowa Code § 8.39 (2011). Like the provisions in *Rush*, section 20 is an appropriately tailored "outgrowth of the legislature's power to appropriate funds." *See Rush*, 362 N.W.2d at 483.

Section 20 uses the type of "phraseology" that, according to *Turner*, identifies a condition. *See Turner*, 186 N.W.2d at 150 (identifying as a "condition" section 4 in the bill at issue, which stated, "No moneys appropriated by this act shall be used for capital improvements"). Section 20 constitutes a "condition," that is, "a provision in a bill that limits the use to which an appropriation may be put." *Colton*, 372 N.W.2d at 189. Accordingly, Governor Branstad could not item veto section 20 without also vetoing the IWD appropriations in sections 15, 17, 18, and 19. *See Welden*, 229 N.W.2d at 713 ("[I]f the Governor desires to veto a legislatively-imposed qualification upon an appropriation, he must veto the accompanying appropriation as well.").

We hold the Governor's item veto of section 20 was unconstitutional.

**D. The Remedy.**  We now turn to the remedy required by our holdings that the Governor's item vetoes of section 15(5) and section 20 were unconstitutional.  The district court granted the remedy sought by plaintiffs in their petition and declared that "Senate File 517 became law as if the Governor had not exercised the item vetoes which were herein determined to be void."  Governor Branstad argues on appeal the proper remedy for an invalid veto of a condition on an appropriation is to invalidate the entire item containing the appropriation.  The Governor is correct on this point.  This remedy is required by article III, section 16, which provides in relevant part:

> Any bill submitted to the governor for his approval during the last three days of a session of the general assembly, shall be deposited by him in the office of the secretary of state, within thirty days after the adjournment, with his approval, if approved by him, and with his objections, if he disapproves thereof.
>
> The governor may approve appropriation bills in whole or in part, and may disapprove any item of an appropriation bill; and the part approved shall become a law.

Iowa Const. art. III, § 16.

Senate File 517 is an appropriation bill that was presented to the Governor on June 30, 2011, the last day of the legislative session.  Bills presented to the Governor during "the last three days of a session of the general assembly" do not become law without the Governor's affirmative approval.  *Rants,* 684 N.W.2d at 210–11 (citing Iowa Const. art. III, § 16). The Governor has thirty days to approve or disapprove the bill.  *Id.*  This is known as the "pocket veto" period because the bill fails if the Governor takes no action.  *Id.* at 201, 210.  In this case, Governor Branstad's timely transmittal letter to Secretary of State Schultz stated, "Senate File 517 is approved on this date with the following exceptions, which I

hereby disapprove." The letter went on to identify the provisions the Governor disapproved by exercising his item veto.

In *Rants*, Governor Vilsack item vetoed parts of a nonappropriations bill presented to him during the last three days of the session. *Id.* at 211–12. We held his item vetoes were invalid and as a result the entire bill failed. *Id.* We stated, "[N]o portion of HF 692 became law because the entire bill did not receive the affirmative approval of both the Legislature and Governor . . . ." *Id.* at 212. This result was required because nonappropriations bills must be approved or disapproved in their *entirety,* and an invalid item veto cannot constitute approval. *Id.*

By contrast, our constitution provides the Governor "may approve appropriation bills in whole or in part, and may disapprove any item of an appropriation bill; and the part approved shall become law." Iowa Const. art. III, § 16. Because the Governor may approve or disapprove any *item* in an appropriation bill, an ineffective item veto is not fatal to the entire bill, but only to the affected items.

We hold that, when the Governor impermissibly item vetoes a condition on an appropriation during the pocket veto period, the appropriation item fails to become law. This result is mandated by our constitutional requirement that enactments do not become law without the approval of both elected branches except when a legislative supermajority overrides a veto. Here, the Governor did not approve the IWD appropriations with the conditions. Yet, the legislature did not pass the appropriations without the conditions. Thus, the IWD appropriations without the conditions could not become law because the approval of both elected branches was lacking.

Specifically, the Governor failed to effectively approve section 15(3), containing the $8.66 million appropriation for the operation of field offices because he failed to approve the accompanying condition defining field offices in section 15(5). The Governor's affirmative approval of section 15(3) was required during the pocket veto for it to become law. Section 15(3) fails for this reason.

Section 20 is a restriction on IWD appropriations. Those appropriations are found in sections 15(1)–(4), 17, 18, and 19. Governor Branstad's approval of those sections was ineffective in light of his failure to approve the accompanying condition in section 20. Accordingly, those sections did not become law. The remaining sections of Senate File 517, affirmatively approved by Governor Branstad, became law.

**IV. Disposition.**

We affirm the district court's summary judgment declaring the Governor's item veto of section 15(5) unconstitutional. We reverse the district court's summary judgment upholding the Governor's item veto of section 20. We remand for entry of judgment in plaintiffs' favor declaring the Governor's item veto of section 20 unconstitutional and further declaring that sections 15, 17, 18, 19, and 20 of division I and sections 61, 63, 64, 65, and 66 of division IV of Senate File 517 did not become law. All other provisions in Senate File 517 affirmatively approved by the Governor became law.

**SUMMARY JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED.**